Case No. 10-3961

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
                    Appellee,


            v.

Guy J. Westmoreland,
                    Appellant.

U.S.C.A.—7th Circuit
FILED

MAR 28 2011  EF

GINO J. AGNELLO
CLERK

From The United States District Court For The
Southern District Of Illinois, No. 98-CR-30022
United States District Judge William D. Stiehl

APPELLANT'S OPENING BRIEF

Guy J. Westmoreland, pro se
Reg. No. 042994-025
U.S. Penitentiary
P.O. Box 33
Terre Haute, IN
          47808

## QUESTIONS PRESENTED

1. WHERE THE DISTRICT COURT WITHOUT HOLDING ANY HEARING DECIDES A RULE 33 MOTION UPON BRADY V. MARYLAND CLAIMS AND CLAIMS OF THE KNOWING USE OF PERJURED TESTIMONY BY VIEWING EACH PIECE OF EVIDENCE ISOLATED FROM THE RECORD, FAILING TO CONSIDER SOME ESSENTIAL EVIDENCE AT ALL, REFUSES NEW EVIDENCE BASED UPON NON-RELEVANT DIFFERENCES OF OPINION BETWEEN THE JUDGE AND AN EYE-WITNESS AND REFUSES TO CONSIDER THE MOST RELEVANT PORTIONS OF THE RECORD WILL THIS COURT CORRECT SUCH ERROR AND COMPEL REVIEW UPON THE WHOLE RECORD IN LIGHT OF THE JURY'S VERDICT?

2. WHERE THE DISTRICT COURT DELAYED THE PROCEEDINGS UPON SUCH SERIOUS CLAIMS IN A CAPITAL CASE FOR OVER EIGHT YEARS WILL THIS COURT REQUIRE EXPEDIENCY AND REVIEW FOR ADDITIONAL DUE PROCESS AND SPEEDY TRIAL VIOLATIONS?

3. WHERE THE RULE 33 MOTION WAS FILED WHILE DIRECT APPEAL WAS PENDING AND APPELLANT REPEATEDLY REQUESTED APPOINTMENT OF COUNSEL PRUSUANT TO THIS COURT'S RULING IN KITCHEN V. UNITED STATES, 227 F.3d 1014 (2000) WILL THIS COURT ACCEPT THE DISTRICT COURT'S DENIAL OF ALL MOTIONS WHERE IT REFUSED FOR EIGHT YEARS TO APPOINT COUNSEL?

4. WHERE THE DISTRICT JUDGE HAS BEEN CHALLENGED FOR BIAS OR THE APPEARANCE THEREOF AND REFUSED TO RECUSE HIMSELF AND NEW EVIDENCE APPEARS SUPPORTING SUCH CLAIM WILL THIS COURT REQUIRE A NEW JUDGE TO ENTERTAIN THE CLAIMS WHERE THE RECORD WOULD AT LEAST CAUSE SUSPICION OF BIAS?

## TABLE OF CONTENTS

Page(s)

Questions Presented ........................................ i

Table of Authorities ....................................... iv

I.    JURISDICTIONAL STATEMENT ............................. 1

II.   STATEMENT OF CASE .................................... 1

III.  HISTORICAL FACTS .................................... 3

      A.   The Charges, Trials And Judgments ............... 3

      B.   Newly Discovered Evidence And Rule 33 Proceedings ... 6

           1.   The New Evidence ......................... 7

           (a). Discovery Of Evidence ..................... 7

           (b). Nature Of The New Evidence ................ 8

           (c). Response And Reply ....................... 12

           (d). District Court Resolution ................. 12

IV.   THE DISTRICT COURT ERRED BY MISAPPLYING THE FACTS AND
      LAW IN DETERMINING THE EVIDENCE WAS NOT NEW ............ 12

      A.   Standard Of Review .............................. 12

      B.   Summary Of argument ............................ 14

      C.   Argument ....................................... 15

           1.   The District Court's Individual Consideration Of
                The Kuehl, Wade, Schmidt And Lahmeyer Affidavits
                Without The Reasonable Inferences Therefrom,
                Failure To Consider Other New Evidence and Its
                Failure To Consider The Evidence Together With
                The Whole Record Defeated Rule 33's Purpose
                To Achieve Justice ........................ 16

           (a). Tina Kuehl's Affidavit ................... 18

           (i). Tina's Affidavit Constituted Newly Discovered
                Evidence And, If Not Of Its Own Force,
                Then By Its Supporting Nature ............. 19

           (ii). Tina's Affidavit Is Overwhelmingly "Material" ... 19

TABLE OF CONTENTS

Page(s)

(b). Trooper McAmish's Statements Are Newly Discovered
      Evidence Which The Court Failed To Review ...... 21

(c). The District Court Omitted Consideration of
      Milkovich's Statements To The Illinois Invest-
      igators And The Contents And Context Of His
      Love-Letters ................................. 22

(d). IRS Agent Martens' Warning To Milkovich About
      Being Alone With Bronnie In Light Of Lahmeyer's
      Affidavit Constitutes New Evidence That The
      Conversation And Affair Occurred In 1998 ....... 24

2.   The District Court Misapplied The Law To Amy
      Wade And Greg Schmidt's Affidavits ............. 29

3.   Milkovich's Recantation Was Not Reviewed In
      Context And His "New Evidence" Revelations
      Were Ignored ................................... 32

4.   The Abortion Evidence Was Not Considered In Light
      Of All The Evidence And Record ................. 35

5.   Failure To Hold Evidentiary Hearing Was Error ... 37

6.   Proper Consideration Of The Claims, Evidence And
      Whole Record Together Requires Reversal And Remand
      For A New Trail Or, Minimally, Remand For A Full
      Hearing Under The Correct Standards ............ 39

V.   THE EIGHT-YEAR DELAY VIOLATES DUE PROCESS OF LAW,
     CONSTITUTIONAL AND STATUTORY SPEEDY TRIAL RIGHTS,
     AND THE FEDERAL RULES ............................... 42

     A.   Standard Of Review ............................. 42

     B.   Summary Of Argument ............................ 42

     C.   Argument ....................................... 43

VI.  THE DISTRICT COURT SHOULD HAVE APPOINTED COUNSEL ........ 45

     A.   Standard Of Review ............................. 45

     B.   Summary Of Argument ............................ 46

     C.   Argument ....................................... 46

TABLE OF CONTENTS

Page(s)

VII.  JUDGE STIEHL SHOULD HAVE RECUSED HIMSELF IN THE INTERESTS
      OF AND FOR THE APPEARANCE OF JUSTICE .................. 47

      A.  Standard Of Review ................................ 47

      B.  Summary Of Argument ............................... 47

      C.  Argument .......................................... 48

VIII. CONCLUSION ............................................. 50

      Appendix A    (affidavit Steve Korris)(single page) ....... 52

      DECLARATION OF SERVICE ................................ 53

Table Of Authorities

Case Law:

Alcorta v. Texas, 355 U.S. 28 (1957) ........................ 13

Backauskas v. Lane, 878 F.2d 1031 (7th Cir. 1989) .......... 14, 38

Barker v. Wingo, 407 U.S. 514 (1972) ....................... 43-45

BATF Corp. v. Old World Trading Co., 41 F.3d 1081 (7th Cir. 1993) 28

Berger v. United States, 295 U.S. 78 (1935) ................ 45

Dozie v. Cady, 430 f.2d 637 (7th Cir. 1970 ................. 44

Fitzpatrick v. United States, 178 U.S. 304 (1900) .......... 47

Golden State Bottling Co. v. NLRB, 414 U.S. 168 (1973) ...... 28

Graves v. United States, 150 U.S. 118 (1893) ............... 28

Harris v. Champion, 15 F.3d 1538 (10th Cir. 19940 .......... 44

Hinckle v. Henderson, 135 F.3d 521 (7th Cir. 1998) ......... 43

Johnson v. Zerbst, 304 U.S. 458 (1938) ..................... 45

Kitchen v. United States, 227 F.3d 1014 (7th Cir. 2000) ..... 46

Kyles v. Whitley, 514 U.S. ___, 131 L.ED. 2d 490 (1995) ..... 13-14, 18, 20,
                                                              21, 32-34, 36, 37,
                                                              39, 45, 50

TABLE OF CONTENTS

Table of Authorities                                    Page(s)

Case Law (Con't)

Larrison v. United States, 24 F.2d 82 (7th Cir. 1928) ....... 13-14

Lowe v. Duckworth, 663 F.2d 42 (7th Cir. 1981) ............. 44

Mooney v. Holohan, 294 U.S. 103 (1935) ..................... 13

Morgan v. United States (Morgan I), 298 U.S. 468 (1936) ..... 38

Morgan v. United States (Morgan II) 304 U.S. 1 (1938) ....... 38

Napue v. Illinois, 360 U.S. 264 (1959) ..................... 13-14

Pyle v. Kansas, 317 U.S. 213 (1942) ........................ 13

Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989) ........... 47

United States v. Agurs, 427 U.S. 97 (1976) ................. 13, 21, 37-40,
                                                             43

United States v. Alanis, 165 F.3d 576 (7th Cir. 1998) ....... 13

United States v. Bagley, 473 U.S. 667 (1985) ............... 18, 36

United States v. Berger, 375 F.3d 1223 (11th Cir. 2004) ..... 46

United States v. Bhutani, 175 F.3d 1015 (7th Cir. 1993) ..... 13

United States v. Dimas, 3 F.3d 1015 (7th Cir. 1993) ........ 14, 18, 20, 27,
                                                             27, 32-34, 38-40

United States v. Douglas, 874 F.2d 1145 (7th Cir. 1986) ..... 13-14, 18, 21

United States v. Esposito, 523 F.2d 242 (7th Cir. 1975) ..... 20

United States ex rel. Smith v. Fairman, 769 F.2d 386
        (7th Cir. 1985) .................................... 27

United States v. Fruth, 36 F.3d 640 (7th Cir. 1994) ........ 12, 14

United States v. Gray, 147 F. Supp. 2d 902 (W.D. Tenn. 2001). 44

United States v. Gray, 52 Appx. 650, 2002 WL31684753
        (6th Cir. 2002) .................................... 44-50

United States v. Jackson, 780 F.2d 1305 (7th Cir. 1986) ..... 14, 10, 32-34,
                                                             39-40

United States v. Joy, 192 F.3d 761 (7th Cir. 1994) ......... 31-32

TABLE OF CONTENTS

Table of Authorities                                          Page(s)

Case Law (Con't)

United States v. Kaufman, 803 F.2d 289 (7th Cir. 1986) ...... 14

United States v. Kuzniar, 881 F.2d 466 (7th Cir. 1989) ...... 16, 25

United States v. Maloney, 71 F.3d 645 (7th Cir. 1995) ....... 13

United States v. Mitrione, 357 F.3d 712 (7th Cir. 2004) ..... 13

United States v. Raskiewiez, 169 F.3d 459 (7th Cir. 1999) ... 13

United States v. Reed, 986 F.2d 191 (7th Cir. 1993) ......... 15

United States v. Reed, 2 F.3d 1441 (7th Cir. 1993) .......... 12

United States v. Rodriguez, 968 F.2d 130 (2nd Cir. 1992) .... 31

United States v. Rollins, 862 F.2d 1282 (7th Cir. 1988) ..... 28

United States v. Salem, 578 F.3d 682 (7th Cir. 2009) ....... 14, 18, 27,
                                                            36-38

United States v. Sblendorio, 830 F.2d 1392 (7th Cir. 1987) .. 28

United States v. Smith, 331 U.S. 469 (1947) ................ 43

United States v. Taglia, 922 F.2d 413 (7th Cir. 1991) ....... 15-16, 18

United States v. Tocco, 135 F.3d 1161 (2nd Cir. 1998) ....... 31

United States v. Westmoreland (Westmoreland I),
        240 F.3d 618 (7th Cir. 2001) ...................... 2, 4, 6, 18,48

United States v. Westmoreland (Westmoreland II),
        312 F.3d 302 (7th Cir. 2002) ...................... 2, 4-6, 20, 34
                                                            48

United States v. Westmoreland (Westmoreland III),
        Case No. 03-1560 (7th Cir.  2003) ................. 3, 6, 44, 48,50

Visser v. Packer Engineering Asso., Inc.,
        924 F.2d 655 (7th Cir. 1991) ...................... 30

Wong Yong Song v. McGrath, 339 U.S. 33 (1950) .............. 38

Youngblood v. West Virginia, 547 U.S. 867 (2006) ........... 27

TABLE OF CONTENTS

Table of Authorities                                     Page(s)

Constitution:

Fifth Amendment ............................................. 43

Sixth Amendment ............................................. 43, 46

Magna Carta, c.29 ........................................... 43

Statutes:

18 U.S.C. § 3005 ............................................ 34, 43, 46

18 U.S.C. § 3006A ........................................... 46

18 U.S.C. § 3161 et seq ..................................... 43

18 U.S.C. § 3231 ............................................ 1

18 U.S.C. § 3500 ............................................ 27

28 U.S.C. § 455 ............................................. 6, 47-48

28 U.S.C. § 1291 ............................................ 1

28 U.S.C. § 1657(a) ......................................... 43

28 U.S.C. § 2072 ............................................ 30

Federal Rules:

F.R.Cr.P. 2 ................................................. 43

F.R.Cr.P. 16 ................................................ 27

F.R.Cr.P. 33 ................................................ 3, 6, 12-13, 15, 30

F.R.Cr.P. 44 ................................................ 46

F.R.Cr.P. 50 ................................................ 43

F.R.E. 102 .................................................. 30

F.R.E. 103 .................................................. 30

F.R.E. 104 .................................................. 30

## I. JURISDICTION

Jurisdiction in the District Court was pursuant to 18 U.S.C. § 3231. The order appealed from was entered on December 13, 2010 and notice of appeal was mailed to the district Court on December 21, 2010 and docketed on December 28, 2010.

This appeal is thus timely and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. STATEMENT OF CASE

On January 6, 1998, Appellant was charged with a drug conspiracy by complaint in the U.S. District Court for the Southern District of Illinois. He was immediately arrested and held. On February 4, 1998, a grand jury indicted him and a co-defendant, Richard Abeln, for conspiring to distribute controlled substances (Count 1) and for killing Abeln's wife Debra by three different means (each charged separately in Counts 2-4) and other offenses. On May 2, 1998, a grand jury returned a superseding indictment recharging Appellant as above but adding additional charges.

On July 24, 1998, the Government filed a notice of intent to seek the death penalty against Abeln and the District Court severed him from trial with Appellant.

Appellant was tried on the drug charge (Count 1) from August 12-20, 1998 and convicted. He was sentenced to life imprisonment. Appellant sought a new trial based upon false testimony by Abela, which was denied. Conviction, sentence and denial of the Rule 33 motion were affirmed and the case was remanded to correct the

illegal sentence. <u>United States v. Westmoreland</u>, 240 F.3d 618 (7th Cir. 2001)(Westmoreland I).

Grand juries recharged Appellant with the variable killings of Debra Abela in a superseding indictment on May 19, 1999 and again on October 19, 1999 and, on December 19, 1999 the Government filed a notice of intent to seek the death penalty, which was certified by the Attorney General. Appellant was tried from May 29 to June 28, 2001 for the variable killings of Debra Abela and was convicted on all Counts.

On October 25, 2001, Appellant was sentenced to 240 months imprisonment on the drug conspiracy (Count 1) and life imprisonment on each of the Counts (2-6) relating to the killing of Debra Abeln.

The Government formally waived (withdrew) its intent to seek the death penalty on November 6, 2001 due to discovery that its key investigator and witness, Martin Milkovich's sexual affair with Appellant's then-wife and key witness, Bronnie Westmoreland.

Appellant appealed the convictions and sentences on Counts 2-6 <u>United States v. Westmoreland</u>, Case No. 3970, which this Court affirmed on December 3, 2002. <u>United States v. Westmoreland</u>, 312 F.3d 302 (7th Cir. 2002)(Westmoreland II).

During direct appeal, Appellant discovered that the sexual affair between Milkovich and his then-wife did not begin in November of 1999 as the Government insisted, but shortly after Appellant's arrest in early 1998 and prior to his first trial. He raised the matter in this Court <u>pro se</u>, while the direct appeal was pending to no avail and consequently filed the matter in the District

Court pursuant to F.R.Cr.P. 33 on October 4, 2002.

Upon allegations fo bias and/or the appearance of bias, Appellant sought recusal of Judge Willian Stiehl by motion pursuant to 28 U.S.C. § 455 on December 16, 2002. The motion was denied on January 23 and Appellant sought a writ of mandamus to compel recusal, which this Court denied. United States v. Westmoreland, Case No. 03-1560 (Westmoreland III).

Appellant repeatedly moved the District Court for appointment of counsel and repeatedly objected to unwarranted extensions of time sought by and granted to the government to respond. Appellant also sought sumamry disposition of his Rule 33 motion during the course of the Government's refusal to respond and after its belated response filed on September 2, 2004. The District Court by MEMORANDUM AND ORDER denied Appellant's Rule 33 motion as supplimented, two motions to appoint counsel and all other motions on December 13, 2010. Appellant's notice of appeal was docketed on December 28, 2010.

Appellant hereby directly appeals such ORDER.

III. HISTORICAL FACTS

A.  The Charges, Trials And Judgments

On January 6, 1998, Appellant was charged with a drug conspiracy by complaint in the U.S. District Court for the Southern District of Illinois. (Doc. 1). He was immediately arrested (Doc. 1) by Illinois State Police Officer Martin (Marty) Milkovich, attached to the U.S. District Attorney's Office as lead investigator for the case. On February 4, 1998, a grand jury returned an indictment against Appellant and co-defendant Richard Abeln charging them with

3

conspiring to distribute controlled substances (Count 1) and charg-
ing Abeln with killing his wife Debra Abeln by three different means
(Counts 2-4) and other offenses. (Doc. 13).[1] Officer Milkovich was
the key grand jury witness and virtually all evidence/testimony was
handled, prepared and/or coordinated by him as lead investigator.

    While these proceedings were underway, on May 21, 1998 a super-
seding indictment was returned recharging Appellant with the above
drug conspiracy and additionally charging him with killing Debra
Abeln by a variety of means. (Doc. 85).[2]

    The Government filed a death-penalty notice against Richard
Abeln on July 24, 1998 (Doc. 109), after which he and Appellant
were severed for trial. See Westmoreland I, at 624. The Government
successfully sought permission to offer evidence against Appellant
for Debra Abeln's murder at his drug conspiracy trial (Doc. 126)
for which he was tried from August 12 through 20, 1998. Appellant
was convicted by hearsay testimony of Richard Abeln (given through
Illinois Officers Marty Milkovich and Calvin Dye) combined with a
jailhouse informant and Abeln's son Ryan Abeln's confession to
police, all of which were obtained and coordinated for the prose-

---

1.  This case in the District Court, Case No. 98CR30022, was brought
here on direct appeal in Case Nos. 99-1491 and 00-1348 the decision
of which is reported in United States v. Westmoreland (Westmoreland
I), 240 F.3d 618 (7th Cir. 2001).

2.  The charges added by the superseded indictment were again super-
seded on May 19, 1999, October 19, 1999, and on January 9, 2001.
The superseded charges involving the killing of Debra Abeln were re-
peated in each subsequent superseding indictment and Appellant was
eventually tried and convicted upon them. Those convictions were
brought here on direct appeal in Case No. 01-3870 the decision of
which was reported in United States v. Westmoreland (Westmoreland II),
312 F.3d 302 (7th Cir. 2002).

cution by Milkovick.

Appellant was charged with killing Debra abeln in a second superseding indictment on May 19, 1999 (Doc. 251) and again on October 19, 1999. (Doc. 377). On December 14, 1999, the Government filed a death-penalty notice certified by the Attorney General. (Doc. 430). More than a year later, on January 9, 2001, Appellant was again recharged in a fourth superseding indictment for killing Debra Abeln (Doc. 628) and his capital murder trial began on May 28, 2001 and ended with guilty verdicts on all counts on June 28, 2001. The Government did not seek the  death penalty and Appellant was sentenced to life imprisonment on each of Counts 2 through 6 on October 25, 2001. (Doc. 844). The death penalty certification was formally withdrawn on November 6, 2001 due to the discovery of a sexual affair between the lead investigator  Marty Milkovich and Appellant's then-wife Bronnie Westmoreland. (Doc. 861).

Milkovich, although the lead investigator and key witness for and fully available to the Government was not called to testify at the second trial or its sentencing phase. Crucial evidence (four tape recorded conversations between Appellant and Richard Abeln) put forward by the Government was admitted based upon Milkovich's testimony from the first trial. See Westmoreland II, at 310. By motion in limine (Doc. 758). The Government sought to preclude Appellant from calling Milkovich for impeachment purposes, which motion was granted.

The official decertification was the direct result of the discovery (allegedly by an anonymous phone call) of an illicit sexual

affair between lead investigator Milkovich and Appellant's then-
wife Bronnie Westmoreland, which, upon investigation, proved to be
true. The Government has insisted there was no impropriety prior to
November 4, 1999 and has endeavored to block and obstruct every
effort of Appellant to compel and full and fair investigation into
the affair and material aspects of its origin and duration.

B.   Newly Discovered Evidence And Rule 33 Proceedings

During direct appeal in Westmoreland II, Appellant discovered
evidence the affair between Government key witnesses Milkovich and
Appellant's then-wife Bronnie Westmoreland had in fact began in
early 1998 and endured throughout the investigatory period during
which Milkovich acted as key investigator and component to virtually
all evidence relative to Westmoreland I and II. He sought to suppli-
ment this court's record in Westmoreland II with such evidence, but
the Court rejected it. He then filed his pro se motion for a new
trial pursuant to F.R.Cr.P. 33 with the District Court on October 4,
2002. (Doc. 890). On April 26, 2004, upon discovery of additional
evidence supporting the claims, he supplimented his Rule 33 motion.
(Doc. 904).

Following submission of his Rule 33 motion, Appellant sought
recusal of Judge Stiehl for bias or appearance thereof pursuant to
28 U.S.C. § 455. (Doc. No. 893). Judge Stiehl denied the motion on
January 22, 2003. (Doc. 895). Appellant sought mandamus to compel
recusal, which this Court denied. See United States v. Westmoreland,
Case No. 03-1569 (Westmoreland III).

6

Appellant also sought appointment of counsel to assist him with the Rule 33 proceedings, (Doc. 899), which he later renewed. (Doc. No. 925).

1.  The New Evidence

(a). Discovery Of Evidence

Appellant alleged in his Supplimental Brief (accepted by the District Court as a Rule 33 Motion) in reference to the new evidence that "[i]t is now known...that the affair started in March of 1998.... Now it has become known." R33 Mot., p.9. See also id., p.12 ("It is now known that, in fact, the illicet sexual escapade was occurring by or before March 1998."); id., p.24 ("...the fact (now known) that the illicet affair occurred (or was occurring) as early as March 1998."); id., p.29 ("Five(5) recently discovered witness(es) have established that the illicet sexual affair between Special Agent Milkovich and Mrs. Westmoreland started in March of 1998, and continued throughout the investigation, grand jury(s), and both trials in this case.").

In April 2004, Appellant Supplimented his motion with "more evidence [that] has come to light," Suppliment, p.2, obtained through his due diligence that supported claims that Milkovich committed perjury at Appellant's grand jury proceedings and first trial (while the Government used key portions of Milkovich's testimony at his second trial) and that a key event relative to the illicit affair occurred in 1998 and not 1999 placing the affair at around March/April 1998.

7

(b). Nature Of The New Evidence

(i). Amy Wade, an associate of Bronnie Westmoreland provided an affidavit that she witnessed Bronnie with a man at a beer garden in Florissant, Missouri during "the weekend of 'Valley of the Flowers'" in "early spring, approximately May 1998" whom she later identified as Special Agent Marty Milkovich. She also witnessed an outburst by Bronnie's then live-in boyfriend Brad Mathews who threatened to "blow [her] cover" and told Amy that Bronnie had had three abortions. See R33 Exh. D (Affidavit of Wade).

(ii). Greg Schmidt, a long-time neighbor and friend of Appellant and his then-wife Bronnie Westmoreland, witnessed a man at Bronnie's home repeatedly in August 1998. He saw the man and Bronnie kiss and saw them enter the house on occassion and later come out wearing different clothes. He witnessed the man in a silverish-blue, Chevy and on occassion in a mid-sized pickup truck of approximately 1996-98 vintage. Schmidt perceived that Bronnie and the man were having an affair at the time and he later saw other men come to her house, including Government witness Ryan Abeln, all of whom he perceived to be having an affair with Bronnie. He positively identified the man as Milkovich at a later period. See R33 Exh. E (Affidavit of Schmidt).

(iii). Tina M. Kuehl, Appellant's sister, witnessed an unknown man at Bronnie's home in March 1998. She saw Bronnie walk out of her bedroom with the man tucking his shirt into his pants. Bronnie told her he was a "friend" of her husband's, who owned a "tar business." She later saw this same man at the prosecution table at Appellant's

first trial. She asked Bronnie why this "friend" of Appellant's was
sitting at the prosecution table and Bronnie denied it was the same
person. When Tina told her it was definitely the same man "without
a doubt," Bronnie "got angry and then left." Tina then inquired as
to the identity of the man and discovered he was Illinois "Special
Agent Marty Milkovich." See R33 Exh. F (Affidavt of Kuehl).[3]

**(iv).** Manny Luna, an associate of Appellant, who helped to run
Appellant's business while he was on vacation, was questioned by
Special Agent Milkovich following the murder of Debra Abeln. Milko-
vich attempted to persuade Luna to say things about Appellant "that
were not true" and to "say what he dictated" and "make up evidence/
testimony" against Appellant. See R33 Exh. H. (Affidavit of Luna).

**(v).** DEA Agent Larry Fox reported that Bronnie Westmoreland had
contacted him and informed him on August 29, 2000 that she was five
weeks pregnant. See R33 Exh. J (Agent Fox's official report).

**(vi).** Milkovich wrote Bronnie love-letters one of which was dated
April 26, 2000 and the other undated but clearly later. See Rule 33
Exh. K. Milkovich wrote Bronnie:

> When I first saw you.... I began to feel like a highschool
> boy all over again. My tummy tingled for the first time
> that I can remember.... It was as if a spell had been cast
> over me.... (4/26/2000 letter).

Spell-bound from the moment he "first saw" Appellant's wife,

---

3. Affidavit was submitted to the District Court with these facts,
but the Court sealed it and refused any hearing on the matter to
explore the sighting. The Court simply ruled it did not occur based
on the Government's denial. Tina has provided a new affidavit in
support of the extensive other new evidence which has come to light
all of which indicate that the Government arguably lied in respect
to Tina's first affidavit and committed fraud on the court in
addition to the other claims raised by Appellant below.

Milkovich began to fabricate a fantasy to turn "Bronnie Westmore-land" into "Bronnie Cotton." (Undated letter). In his mind, he disassociated his love, who became "Bronnie Cotton," with the vile "Bronnie Westmoreland." id. As "Bronnie Cotton," his love-of-loves became sweet, loving, pure and honest. In that fantasy

> Bronnie Cotton has a chance. Inside Bronnie Cotton is a good person. Bronnie Cotton was able to find a man of honor, willing to give up his entire past for her..., because he believed in Bronnie Cotton.... One man loved her so much that he hurt everyone else he loved..., he lost his mind... he is trapped in hell... He is trying to forget the deception & lying of Bronnie Westmoreland, and, instead concentrate on the courage & love of Bronnie Cotton, which once was life's breath to him. (id).

In Milkovich's mind the evil witch Bronnie Westmoreland "is fake: teeth, tans & tits," who "only attract[s] her own kind... convicted felons [and] dopers." id. She "fuck[s] anyone and every-one," including all of her husband's "friends and half his family." id. And, Milkovich discovered, Bronnie Westmoreland "bagged dope [and] used more of it than she's willing to admit," id., presumably to the prosecutors who gave her immunity and the jury to whom she was preparing to testify. Clearly, Bronnie Cotton, unlike that evil Mrs. Westmoreland, attracted "a man of honor" who betrayed "everyone else he loved" and, while that evil Mrs. Westmoreland "fuck[s] anyone and everyone," Bronnie Cotton apparently in poor Marty's mind only "fuck[s]" "m[e]n of honor" who betray all others for her.

**(vii).** Milkovich revealed on January 8, 2004 that he made false reports, altered reports and testified falsely to the grand jury and the District Court in this case at the direction of Assistant

U.S. Attorney Kit Morrissey. He also revealed that to his knowledge
Morissey instructed other agents to alter reports to fit her case.
Moreover, contrary to his statements at Appellant's first trial and
statements made by fellow officer Calvin Dye at that trial and
elsewhere, Milkovich has admitted that Appellant "made no statement
whatsoever to police when he was arrested," but lawyered up. He did
the smart thing." See Suppliment to R33 Motion Exh. B and C (affi-
davits of Investigator Steve Korris and Renee Westmoreland).

**(viii).** Thomas J. Lahmeyer provided information in the summer of
2002 that two men, one of whom introduced himself as an Illinois
highway Patrol Detective, met him at his farm adjacent to the Louis
Westmoreland farm. He described one of such officers with features
consistent with those of Milkovich. The officers were looking for
a light-colored Dodge truck. As he had cattle on the Westmoreland
farm, he invited the officers to accompany him while he fed them,
which they did in search of the truck. The visit occurred in late
March/early April 1998. Suppliment to R33 Motion Exh. O (Affidavit
of Lahmeyer).

**(ix).** Interviews, testimony, hearing transcripts, reports and find-
ings generated by the Illinois State Police into the affair includ-
ing statements of Milkovich and officers directly involved with him
that established that the affair began at least emotionally, if not
physically, as early as March 1998 and in any case was occurring
prior to Appellant's first trial all of which was submitted to the
District Court. (Doc. 926).

11

(c). <u>Response And Reply</u>

After repeated and excessive delay, the Government filed a response to the R33 motion on September 29, 2004. (Doc. 918). Due to the excessive and unwarranted delay, Appellant had moved the District Court to proceed summarily and enter summary judgment with sanctions against the Government for the delay. (Doc. 917). Appellant filed his reply to the government's response on December 1, 2004. (Doc. 923). The reply did not address or contest the evidence cited above under B(iv), (v), (vii)(except for the arrest statement), (viii) or (ix)(other than generically).

(d). <u>District Court Resolution</u>

The R33 motion languished in the District Court for years. No hearing was ever ordered. Appellant moved the court for a determination of status on February 12, 2008 (Doc. 931) and by letters and phone calls to the Clerk's Office thereafter to no avail.

More than eight(8) years after the R33 motion was filed, on December 13, 2010, the District Court denied the motion, the motions for appointment of counsel and all other outstanding motions relative thereto. (Doc. 932).

IV.   <u>THE DISTRICT COURT ERRED BY MISAPPLYING THE FACTS</u>
      <u>AND LAW IN DETERMINING THE EVIDENCE WAS NOT NEW</u>

A.    Standard Of Review

Ordinarliy, denial of a Rule 33 motion for a new trial is reviewed for abuse of discretion. <u>United States v. Fruth</u>, 36 F.3d 640, 652 (7th Cir. 1994); <u>United States v. Reed</u>, 2 F.3d 1441, 1451

12

(7th Cir. 1993); United States v. Douglas, 874 F.2d 1145, 1159

(7th Cir. 1986). However, Brady claims[4] involving pure issues of

law are reviewed de novo, United States v. Bhutani, 175 F.3d 572,

576 (7th Cir. 1998)(citing United States v. Maloney, 71 F.3d 645,

652-53 (7th Cir. 1995), while mixed questions fo law and fact are

reviewed de novo as well. United States v. Alanis, 165 F.3d 576, 583

(7th Cir. 2001)(citing United States v. Raskiewicz, 169 F.3d 459,

462 (7th Cir. 1999).

This Court applies a four-part test in deciding Rule 33 motions

upon newly discovered evidence including claims that a government

witness committed perjury. United States v. Mitrione, 357 F.3d 712,

718 (7th Cir. 2004)(overruling Larrison v. United States, 24 F.2d

82 (7th Cir. 1928)(establishing three-part test)). See Reed, 2 F.3d

at 1451 (distinguishing four-part "general" test with three-part

Larrison test). The four-part test does not apply where, as here,

the government knew of the perjured testimony. Mitrione, 357 F.3d

at 718 (establishing "reasonable probability test for Circuit "as-

summing as in this case that the government did not knowingly pre-

sent the false testimony"). Thus, "[a] new trial should be ordered,

on the basis of the prosecution's use of perjured testimony, if the

defendant establishes that 1) the prosecution's case included per-

jured testimoly; 2) the prosecution knew, or should have known, of

the perjury; and 3) there is any likelihood that the false testimony

---

4. Brady v. Maryland, 373 U.S. 83 (1963) as developed from Mooney
v. Holohan, 294 U.S. 103 (1935), Pyle v. Kansas, 317 U.S. 213 (1942),
Alcorta v. Texas, 355 U.S. 28 (1957), Napue v. Illinois, 360 U.S.
264 (1959). See Kyles v. Whitley, 514 U.S. ___, ___, 131 L.Ed.2d
490, 505 (1995)(deliniating origin and evolution of Brady princi-
ples); United States v. Agurs, 427 U.S. 97, 103 & n.8 (1976)(same).

could have affected the judgment of the jury." Douglas, 874 F.2d
at 1159 (citing United States v. Kaufman, 803 F.2d 289, 291 (7th
Cir. 1986)(citing Larrison) and Napue v. Illinois, 360 U.S. 264,
269-71 (1959)).

Moreover, where the motion is based upon undisclosed material
evidence "the standards to be applied" are those developed through
Brady v. Maryland and its progeny, id., 874 F.2d at 1161,[5] which
requires review of the entire record, United States v. Jackson, 780
F.2d 1305, 1311 (7th Cir. 1986)(cite omitted), which includes an
"existing or potential evidentiary record." Kyles v. Whitley, 514
U.S. ___, ___, 131 L.Ed 2d 490, 509 (1995). And, where materiality
is uncertain, inquiry is required into "whether the prosecution
acted in bad faith." United States v. Dimas, 3 F.3d 1015, 1020
(7th Cir. 1993). See United States v. Jackson, 780 F.2d 1305, 1311
n.4 (7th Cir. 1986); Fruth, 36 F.3d at 653 n.8 (under Brady and its
progeny an "aggravating factor will provide "a much stronger case
for a new trial"). Finally, where the record leaves an ultimate
fact upon a Brady-type claim inconclusive or leaves the Court won-
dering, remand for a full evidentiary hearing is required. United
States v. Salem, 578 F.3d 682, 583-90 (7th Cir. 2009); Dimas, 3
F.3d at 1017-20. Cf. Barkauskas v. Lane, 878 F.2d 1031, 1033-34
(7th Cir. 1989).

B.    Summary Of Argument

The District Court held that the affidavits of Tina Kuehl,

---

5.    See Note 4, supra (citing cases).

Amy Wade, Greg Schmidt and Thomas Lahmeyer did not constitute newly discovered evidence for purposes of Rule 33 by finding Tina's affidavit involved information known prior to the murder trial, Wade and Schmidt's affidavits (although positively identifying Milkovich) failed to state how they did so, and that Lahmeyer's affidavit's identification of one of two officers therein differed from Judge Stiehl's own memory of the time (i.e., 1998). The Court failed to view the newly alleged evidence together, with appropriate inferences and against the available record as a whole, although Appellant alleged perjury, the knowing use of false testimony, withholding of material evidence, destruction of evidence and fraud on the court by the prosecution. In context and viewed together, the record prima facially shows the evidence is new for purposes of Rule 33 and that the claims are meritorious. To Deny the motion without reviewing all of the evidence together with reasonable inferences therefrom and without resolving uncertainties by evidentiary hearing was error depriving Appellant of judicial review within the meaning of Rule 33 and contrary to its purpose - i.e., the interests of justice.

C.   Argument

For purposes of Federal Rule of Criminal Procedure 33 "[t]he 'interest in justice' [is] the operative term," United States v. Taglia, 922 F.2d 413, 415 (7th Cir. 1991), but "[t]he Rule does not define it." United States v. Reed, 986 F.2d 191, 192 (7th Cir. 1993). Nevertheless, "courts have interpreted Rule 33 to require a

new trial in a variety of situations in which trial errors or omis-
sions have jeopardized the defendant's substantial rights." id.
See United States v. Kuzniar, 881 F.2d 466, 470 (7th Cir. 1989)
(cite omitted). Elaborating somewhat on the Rule's "operative term,"
this Court has admonished against "confus[ing] a practice with a
rule" by noting that neither the Rule's "text or history...supports
a catagorical distinction between types of evidence" cognizable
thereunder and found no "sense" in such "distinction." Taglia, 922
F.2d at 415 (refusing to distinguish "evidence...merely impeaching"
from other evidence). Accordingly, the "practice" of excluding im-
peachment evidence from the Rule "should not be taken to imply a
rule that even if the defendant proves that his conviction almost
certainly rests on a lie, the district court is helpless to grant
a new trial." id.

1.   The District Court's Individual Consideration Of The Kuehl,
     Wade, Schmidt And Lahmeyer Affidavits Without The Reasonable
     Inferences Therefrom, Failure To Consider Other New Evidence
     And Its Failure To Consider The Evidence Together With The
     Whole Record Defeated Rule 33's Purpose To Achieve Justice

The Government concedes an earlier affair "would have infected
the basic investigation of the case," Govt's Response, p.13 (Doc.
918), and prejudice the Court's earlier finding to the contrary by
which it precluded Milkovich as a witness, id., while rendering
"all of the evidence in the case...untrustworthy." id., p.15. In-
deed, AUSA Kit Morrissey testified at the Illinois Administrative
Hearing that "up to th[e] point" Milkovich began the affair he "was
central to the investigation...ha[ving] obtained the confession of

Richard Abeln," <u>Administrative Hearing</u> ("S.H."), p.433, (Doc. 926),
and an earlier date would "cal[l]" all evidence "into question."
<u>id</u>. The affair showed that "neither [Milkovich nor Bronnie] can
be trusted." <u>id.</u>, p.428.

The District Court agreed that an earlier date would arguably
impeach the entire case. <u>Memorandum and Order</u>, p.7 (Doc. 932). "The
affair was a 'significant issue in the case,' and was the reason
the government chose not to seek the death penalty against Appell-
ant." <u>id.</u>, p.3. However, the Court found that the "records and in-
vestigative files" provided by the Government prior to the murder
trial contained "nothing" to show it began earlier, <u>id.</u>, p.4, and
that although Appellant's pre-trial submission "'hint's at an
earlier meeting between'" Milkovich and Bronnie, it "'does not
clearly, or even likely, establish any sexual relationship existed.'"
<u>id</u>. (quoting previous ruling (Doc. 758)). Purporting to have review-
ed the pre-trial and Rule 33 record, the Court stated it found
<u>nothing</u> to "support a finding" of any pre-November, 1999 affair. <u>id</u>.
Nevertheless, the court asserted "review [of] each...allegatio[n]
individually," <u>id.</u>, with especial "car[e]" due to the inordinately
"extreme age of these pending motions." <u>id.</u>, p.5 n.3.[6]

Proceeding under this Circuit's general four-part test for Rule
33 motions, <u>Id.</u>, p.6 (citing cases), the Court denounced considera-
tion of impeachment evidence, <u>id.</u>, and purported a rule that

---

6. The Rule 33 motion was filed on October 4, 2002 (Doc. 890)
languished over objections without a response until September 29,
2004 (Doc. 918) and continued to languish over further objections
until denied without any hearings on December 13, 2010 (Doc. 932)
a total of over eight(8) years.

"[o]rdinarily, 'newly discovered impeachment evidence will not war-
rant a new trial under Brady v. Maryland, 373 U.S. 83 (1963)." id.,
pp.6-7 (no citation supplied).[7]

(a). Tina Kuehl's Affidavit

The District Court initially focused on "the affidavit of Tina
Kuehl, defendant's sister" finding it "fatal to a claim of 'newly
discovered' evidence" that Appellant failed to "provide how and,
most importantly, when he learned of the revelation which his sis-
ter made." Id., pp.17-18. "Critically," held the Court, "the defen-
dant asserts that the Kuehl affidavit is the same affidavit which
the Court rejected in the 1998 drug trial." (citing Westmoreland I).
Having previously ruled that evidence submitted at the murder trial
did not support "an earlier start date to the affair" the current
evidence embraces "the same claim, and the same basic evidence" and
because Tina is Appellant's sister, her new affidavit cannot "in
any manner" constitute "'newly discovered'" evidence, id., p.8, in
part because of purported "evidence that [Tina] assisted Bronnie in
the destruction of evidence and obstruction of evidence," id.
(citing Trial Trans., Vol. VII, pp.135-40; Vol. X, pp.34-35), the

---

7.  This Circuit and the Supreme Court to the contrary have long
held no difference under Brady between exculpatory and impeachment
evidence. Dimas, 3 F.3d at 1018; Douglas, 874 F.2d at 1145. See
United States v. Bagley, 476 U.S. 667, 676 (1985); Kyles v. Whitley,
514 U.S. ___, ___, 131 L.Ed.2d 490, 505 (1995)("Bagley...disavowed
any difference between exculparoty and impeachment  evidence for
Brady purposes as well, Taglia, 922 F.2d at 415, and recently both
recognized the non-distinction, while emphasizing its constitutional
import relative to Brady-type claims. Salem, 578 F.3d at 685-97.
Notably, Salam, Dimas, Douglas and Taglia are all Rule 33 proceedings.

Court refused to find the evidence "material." id.

(i). Tina's Affidavit Constitutes Newly Discovered Evidence And,
     If Not Of Its Own Force, Then By Its Supporting Nature

Tina's affidavit is dated June 11, 2002. See R33 Exh. F.
Defendant never "asserted" that this affidavit "is the same affi-
davit" rejected in the 1998 drug trial. In fact, Appellant is un-
aware of any similar affidavit submitted in the drug trial in 1998.
In any case, Tina's 2002 affidavit was never submitted in the Dist-
rict Court prior to its submission in this Rule 33 proceeding.

Tina provided a similar affidavit to Appellant's counsel just
prior to the murder trial, which he filed. (Doc. 754). See Appel-
lant's Pro Se Reply to Govt's Response to R33 Motion, p.11 (Doc.
923). That evidence was held to be so insufficient as to "only
hin[t] at an earlier meeting between" Milkovich and Bronnie and in-
sufficient to compel a hearing. Tina's 2002 affidavit expressly id-
entifies how, when and under what circumstances she witnessed exid-
ence of a sexual affair involving Bronnie and a man she later pos-
itively identified as a man sitting at the prosecution's table at
Appellant's trial. She learned he was Milkovich by direct inquiry.
See R33 Exh. F. Tina's present affidavit in conjunction with other
new evidence and the existing record clearly does more than "hint"
at an earlier meeting between the culprits.

(ii). Tina's Affidavit Is Overwhelmingly "Material"

The Court held Tina's affidavit would not "rise to the level
of material evidence that would likely lead to acquital in the event

19

of a retrial," because of her "relationship" to Appellant "and the
evidence that she assisted Bronnie in the destruction of evidence
and obstruction of justice after the murder of Debra Abeln." Id.
(citing Trial Trans, Vo. VII, pp.145-150; Vol X, 34-35).

Initially this "evidence' (at least that from Trail Trans.,
Vol. X, pp.34-35) was held by this Court to be without "any valid
basis." Westmoreland II, 312 F.3d at 311. Moreover, if the affidavit
is true its materiality is clear by the Court's admission that "if
the affair began earlier..., then the impeachment may have been
relevant to the investigation itself" with a "potentially...viable
challenge to the evidence itself." Doc. 932 pg.7, See Govt's Resp., p.13
(an earlier affair "would have infected" the entire "case" and pre-
judice the Court's earlier decision); id., p.15 (an earlier date
would render "all evidence in the case...untrustworthy.")

The Court identified its own error. It reviewed "each...alleg-
atio[n] individually," Id., p.4 and never reviewed the evidence
together as a whole. "'[T]he materiality determination is not to be
made in a vacuum; rather it must be made in the context of all the
evidence at trial.'" Jackson, 780 F.2d at 311 (quoting United States
v. Esposito, 523 F.2d 242, 248 (7th Cir. 1975)). See Dimas, 3 F.3d
at 1020 (requiring review of all evidence vis-a-vis admissible Brady
evidence). See Kyles, 514 U.S. at ___, 131 L.Ed 2d at 509 (favor-
ability determination of evidence "often turn[s] on the context of
the existing or potential evidentiary record"). Moreover, it applied
the fourth prong of the standard for general Rule 33 motions - i.e.,
no likelihood of acquittal, Doc. 932, p.8, rather than this Cir-
cuit's standard for Rule 33 proceedings alleging the known use of

20

perjured testimony. Douglas, 874 F.2d at 1159 ("any likelihood that
the false testimony could have affected the judgment of the jury")
(cite omitted).

Both the District Court and Government acknowledge that an
earlier date to the affair would put the evidence of the whole case
in jeopardy and a successful Brady claim requires no more. Kyles,
514 U.S. at ___, 131 L.Ed.2d at 506 ("showing that favorable evid-
ence could reasonably be taken to put the whole case in such a
different light as to undermine confidence in the verdict" is a
conclusive Brady violation). Indeed, "the significance of an item
of evidence can seldom be predicted until the entire record is
complete." United States v. Agurs, 427 U.S. 97, 108 (1976).

Thus, even if Tina's affidavit is itself not "newly discovered
evidence" alone, it is material evidence relative to the claims
raised under evidence that is unquestionably "newly discovered" and
all evidence must be reviewed together.

(b). Trooper McAmish's Statements Are Newly Discovered Evidence
Which The Court Failed To Review

Illinois State Trooper McAmish testified at the Administrative
Hearing that he met Bronnie in 1998 when he interviewed her rela-
tive to the murder investigation, A.H., p.639, and saw her with
Milkovich in February 2000 at a bar in Springfield. id., p.637.
The two had discussed an affair Milkovich had been having for some-
time, 8/2/00 Interview, p.5, which conversations occurred prior to
Milkovich's transfer to District 18 after which they talked very
little. id. Milkovich told Mcamish that Bronnie was the woman he

had been seeing and that he met her during a case he had been work-
ing on. id. As Milkovich's transfer to District 18 occurred in Sept-
ember 1998, every possible inference is that the affair in question
was active prior thereto. See Appellant's Pro Se Reply, pp.6-7 (cit-
ing to A.H. records). Thus, whether Bronnie's affidavit is viewed
as "newly discovered" evidence in isolation or not, with McAmish's
testimony and statement together they do. Regardless McAmish's are
new and when viewed in context with Kuehl's at least corroborating
evidence it too is new evidence.

By placing the conversation before Milkovich's transfer to
District 18, i.e., September 1998, it is clearly material, support-
ing Appellant's claims of the knowing use of perjury, withholding
of material evidence and fraud. But, the new evidence does not stop
there. The Court ignored McAmish entirely although Appellant em-
phasized its import. Appellant's Pro Se Reply, pp.6-7.

(c). The District Court Omitted Consideration Of Milkovich's
     Statements To The Illinois Investigators And The Contents
     And Context Of His Love-Letters

Milkovich's statements to the Illinois investigators coupled
with his love-letters to Bronnie clearly indicate that the affair
was underway in 1998. The exact date Milkovich first saw Bronnie is
uncertain but presumably was at the time of Appealnt's arrest by
Milkovich or soon thereafter. Milkovich's central role in the case ,
his sitting at the prosecution table during proceedings and his
lead investigating role indicates a date early in 1998. During the
State Police Investigation, Milkovich claimed he first spoke to

22

Bronnie during a smoke break during Appellant's first trial,
7/27/00 Interview, p.5, which Bronnie denied. A.H., p.292. Although
AUSA Morrissey is undoubtedly correct that "neither of them can be
trusted," A,H,, p.428, as Milkovich states with some certainty that
he first talked to her during the first trial, it must be assumed
that personal contact occurred at least by approximately mid-August
of 1998 and he therefore "first saw" her and fell under his "spell"
no later than that.

Milkovich, however, admitted to Illinois Investigator Master
Sargeant Hillman that he had had "anxiety problems" since March of
1998 and directly associated them with Bronnie and his "'run[ning]
around'" behind his family's back "to see her." 7/27/00 Int., p.13.
He reminded Hillman that he had mentioned those very "anxiety prob-
lems" to him "and Captain SLOMAN" at the time Hillman was "District
18 Investigations Commander when [he] went up there." id. Thus, by
Milkovich's admissions he was suffering severe emotional problems
by March of 1998 associated with Bronnie and "this case," he carri-
ed those "anxiety problems" with him when he transferred to District
18 in September of 1999 and these admissions correspond precisely
with Tina's sighting of Milkovich at Bronnie's house in March of
1998 as well as McAmish's statements. In context and together, this
evidence is new and prima facially proves Appellant's claims. But
still, there is more.

In his love-letters, Milkovich says the "spell" he fell under
occurred when he "first saw" Bronnie. Appellant's affidavits say
they saw him with her between March and August 1998 and Milkovich

says he talked to her in August 1998. By his words, he had to be under the "spell" at least by then. As the murder investigation was underway at that time with Milkovich as the evidentiary matrix, the taint to the evidence, which is the ultimate underlying issue, began at least during Appellant's first trial. The District Court, contrary to its statements that it considered all evidence and claims, clearly avoided Milkovich's statements - except a grudging glance at his recantation - with apparent deliberation. It remains un-addressed.

(d). <u>IRS Agent Martens' Warning To Milkovich About Being Alone With Bronnie In Light Of Lahmeyer's Affidavit Constitutes New Evidence That The Conversation And The Affair Occurred In 1998</u>

The District Judge dismissed Thomas Lahmeyer's affidavit be-cause Lahmeyer's identification of the officers he assisted to roam the Westmoreland farm in 1998 differed from his own recollection of Martens' "build" and "hair" color, <u>Memorandum and Order</u>, p.13 n.5, and held that Martens was not one of the two officers who visited the farm. <u>id.</u>, p.12-13. Martens, however, testified at the Admin-istrative Hearing that it was in fact he and Milkovich who visited the farm at which time its "caretaker" let them in. <u>A.H.</u>, pp.251, 257. Martens testified that either during that trip or another trip - both of which were made as part of a search for a blue pickup truck - Martens warned Milkovich about being caught alone with Bronnie. <u>A.H.</u>, pp.241-42, 252. Martens' thought the trip occurred in 1999, but "caretaker" Lahmeyer expressly recalled the officers being there in late March or early April 1998 looking for a light-

24

colored Dodge pickup, Suppliment Exh. O (Doc. 904), which the
Government had been looking for since early January of 1998. See
Govt's Response to Motion in Limine, 98CR30022, Aug. 5, 1998.

Thus, except for the date, Martens' description of the trip
and Lahmeyer's are virtually identical. The only reason Judge Stiehl
refused to consider Lahmeyer's affidavit appears to be that his
definition of "medium build" and "brown hair" differs from Lah-
meyer's. The Court stated that "[t]he affidavit is, therefore, not
persuasive that agents Milkovich and Martens were the two individ-
uals at the farm in 1998." Doc. 932, p.13 n.5. This is strange
reasoning. What are the chances that an identical trip for an
identical purpose involving otherwise identical officers gaining
entrance to the farm by the caretaker would occur twice and Lah-
meyer not note such fact or the Government would fail to produce
the report of the other officers that did so? More unreasonably,
Martens testified that he was the officer and, as only one such
trip is of record, presumably Judge Stiehl's memory is wrong of his
definitions differ as to the facts.

Judge Stiehl of course was not there. He was not a witness and
precise identification has always been considered in light of cir-
cumstances surrounding events. As everything else about the inci-
dent indicate that it occurred as the participants claim, Martens'
identity is virtually a given. Judge Stiehl has simply interposed
to decide a pure "credibility" question, which is beyond his jud-
icial role. Kunziar, 881 F.2d at 470. The issue belongs to the
trial jury. Both Rule 33 and Brady-type claims are directed to the

potential effects upon the trial jury of the newly discovered evidence. That jury could have found the trip to the Westmoreland farm involved Martens and Milkovich even if the trial judge thought Lahmeyer's precise identity markers (a mere difference of opinion) differed from his own.

Judge Stiehl omitted consideration of Milkovich's statements to Steve Korris and Renee Westmoreland on January 8, 2004 that Martens lied at the Administrative Hearing and the trip occurred exactly when Lahmeyer said it did - spring of 1998. See Suppl. Affidavits B ¶17 and C ¶9 (Doc. 904).

The point is that Martens would have testified at the trial that he was the other officer. Once that was established, the question would have turned upon the date. If the jury believed Lahmeyer that the correct date was March/April 1998, they could have disbelieved the admittedly untrustworthy Bronnie that the affair, which then would have been a substantive matter involving the entire case, had been on-going all along and no evidence was thus trustworthy. Moreover, Milkovich would had to have been produced and Tina would have been permitted to testify. Milkovich would have explained his "anxiety problems" since March 1998 to them as well as the horrible "spell" of love he suffered.

Presumably both Martens and Milkovich made notes and reports about the details of the trips searching for the blue pichup truck including their trip together to the Westmoreland farm. The dates of these trips would be on such notes and reports. They were, according to Martens, official investigative trips. Arguably, they

26

were discovery material at the time of trial under F.R.Cr.P 16
(and potentially under 18 U.S.C. § 3500). And, although Martens'
did not testify at the trial, he was apparently (according to
his statements to the Illinois investigators) an active investi-
gating officer in the murder case. As such, he apparently became
aware of Milkovich's involvement with Bronnie and that awareness
is attributable to the prosecution. Salem, 578 F.3d at 685 ("The
Brady obligation applies even when the suppressed evidence is
known only to police and not to prosecutors.")(citing Youngblood
v. West Virginia, 547 U.S. 867, 869-70 (2006)); Dimas, 3 F.3d at
101 n.1; United States ex rel. Smith v. Fairman, 769 F.2d 386, 391-
92 (7th Cir. 1985). He thus became a crucial witness himself!

There is an ominous omission by the Government and the Dist-
rict Court. Martens said that one of the two trips - i.e., one to
the Westmoreland farm and one searching junk yards - occurred in
1998. The Government claims that "[i]n May, the Drug Enforcement
Administration received an anonymous tip that Bronnie was having an
affair with an officer assigned to the case." Govt's Resp., p.12
(citing Doc. 577). Yet, according to Martens, he was aware of it
in 1999 (if we presume his recollection over Lahmeyer's). Did he
report it as was his duty? Under the rule of regularity, he did.
If not, why not? If so, the prosecution knew of the affair in 1999.
When in 1999? The record does not reveal. Was it before November
1999? If Lahmeyer was wrong about the year, but correct on the
month - i.e., late March/early April, it would have been about nine

months earlier than alleged by the Government and it would prove
that Bronnie committed perjury at the murder trial, the Government
knew of the perjury and sought to prevent Milkovich's testimony to
ensure suppression.

The Government has produced no investigative reports or notes
by either Martens of Milkovich relative to their trip to the West-
moreland farm or the junk yards. Two officers from two different
agencies should have produced two reports. Those reports, assuming
the officers provided them to their superiors in the case, would
clarify the date. As these reports are exclusively in the Govern-
ment's possession, this Court should, (as the District Court should
have), infer that they have not been produced in this proceeding,
because they will prove the trips and, hence, the discussion of
Milkovich with Bronnie, occurred much earlier than the Government
claims and most likely in late March/early April of 1998. See BATF
Corp. v. Old World Trading Co., 41 F.3d 1081, 1098 (7th Cir. 1993)
(applying "adverse inference rule")(citing cases). See Golden
State Bottling Co. v. NLRB, 414 U.S. 168, 174 (1973). And see
United States v. Rollins, 862 F.2d 1282, 1297 (7th Cir. 1988)(appl-
ying related rule from Graves v. United States, 150 U.S. 118, 121
(1893)). United States v. Sblendorio, 830 F.2d 1392, 1390 (7th Cir.
1987)(applying Graves and citing cases).

These reports are now crucial for another reason. Martens said
the discussion occurred after Bronnie had been granted immunity.
If those reports show a date prior to October 1999, that will con-
stitute evidence that the Government whited-out the date on the

28

immunity letter to save their case in light of the revelations
concerning the affair. Thus, the reports have become <u>Brady</u> mater-
ial, themselves and will potentially disclose further instances
of the knowing use of perjured testimony and other corrupt acts by
the prosecuter's office. Moreover, the <u>nature</u> of the trips indicate
very active investigation for key evidence at a time when Milkovich
was still "central to the investigation" and Bronnie had (according
to the  Government) not yet been given immunity.[8]

2.   <u>The District Court Misapplied The Law To Amy Wade And
     Greg Schmidt's Affidavits</u>

     The Court found the Wade/Schmidt affidavits would not support
a motion "for a new trial, or even a hearing on that motion," <u>Doc.</u>
932, p.8, and "fatal to their admissibility" that they did not pre-
cisely explain "how the[y] may have been able to identify the indi-
vidual allegedly involved with Bronnie as Milkovich." <u>id</u>. The eye-
witness sightings were held not to "qualify as 'newly discovered'
evidence," because "[n]o matter how presented..., this information
was known, and in fact, was raised at trial." <u>id</u>., pp.8-9.

     First, the "information" attested in those affidavits was <u>never</u>
known to Appellant prior to the trial and was <u>never</u> "raised at trial."

---

8.  Appellate reminds this Court, as he did the District Court, that
mysteriously and suspiciously the prosecution's letter granting
Bronnie wholesale immunity is <u>undated</u>. <u>See</u> R33 Exh. M. The Govern-
ment claims they provided the immunity in October of 1999. If a re-
port of the trip to the Westmoreland farm or the junk yards turns
up involving Martens and Milkovich prior to October 1999, it would
be strong evidence that the immunity began earlier, the immunity
letter was doctored and the Government both suppressed and destroyed
evidence, while subborning perjury. Martens claimed the discussion
followed the grant of immunity. <u>See</u> A.H., p.252.

The Court is construing Tina's pre-trial affidavit regarding a sighting of Milkovich and Bronnie in Bronnie's home in March 1998 with the completely unrelated sightings by Wade and Schmidt at other times and places. Appellant had no way of knowing of these later sightings.

Second, the Federal Rules of Evidence are to be applied "to the end that the truth may be ascertained and proceedings justly determined." F.R.E. 102. Rule 33 is directed to "the interests of justice." Moreover, in determining admissibility of evidence the court "is not bound by the rules" except regarding privileges. F.R.E. 104(a). Finally, "the court shall admit" evidence "subject to" introduction of evidence "sufficient to support a finding of the fulfillment of [a required] condition." F.R.E. 104(b). The rules regarding admissibility must give way to substantive rights. 28 U.S.C. § 2072(b). Cf. F.R.E. 103(a) and (d)(error noticable on admissibility rulings in clash with substantial rights).

Appellant notified the Court that Wade and Schmidt will testify "at hearing that each identified a photograph of Milkovich." Appellant's Pro Se Reply, p.10 n.2.[9] Both Affiants positively saw Milkovich and neither equivocated on the identity. R33 Exh. D & E. It is well-settled that personal knowledge is inferable, Visser v. Packer Engineering Asso., Inc., 924 F.2d 655, 659 (7th Cir. 1991) (cites omitted), and "includes...inferences grounded in observations or other first-hand experiences." United States v. Joy, 192

---

9. Appellant possesses affidavits from each with a copy of the photo by which they made their identifications.

F.3d 761, 767 (7th Cir. 1999). Moreover, it "need not reach the level of absolute certainty to be admissible." id. (citing United States v. Rodriguez, 968 F.2d 130, 143 (2nd Cir. 1992)).

> Rather, the key question for the trial court is whether a reasonable trier of fact could believe that the witness had personal knowledge of the facts about which he testified.

id. (citing United States v. Tocco, 135 F.3d 116, 128 (2nd Cir. 1998)(emphasis added).

Wade closely socialized with Bronnie and stayed with her at her home. R33 Exh. D. She accompanied Bronnie to a beer garden where Bronnie associated with a strange man while married to Appellant. id. Appellant was big news. Charged with murdering the same woman five(5) times as part of a sensationalized drug conspiracy, Wade would naturally be curious. Milkovich was the lead investigator of the most notorious case Wade had ever been near. He became a public and publicized figure in the local media. It is readily inferable that she would pay attention to events so near and recognize Milkovich's picture on t.v. and in the paper media especially when it exposed the affair. A jury could easily believe under such circumstances she would have developed personal knowledge of Milkovish's identity. Joy, 192 F.3d at 767.

Schmidt was a near-by neighbor and friend of Appellant and his wife for years prior to this most sensationalized case. R33 Exh. E. Repeatedly seeing the strange man with Bronnie - even kissing him, id., clearly aroused his inquisitiveness. id. As a neighbor, friend and concerned citizen, Schmidt would have been derelict to not seek personal knowledge of the stranger's identity. As the affair and

Milkovish's picture eventually became public, it is believeable
that Schmidt would notice. Joy, 192 F.3d at 767.

And, again, as this is a Rule 33 motion involving discovery of
withheld evidence of an earlier affair, it must be assessed in
light of all the evidence and the whole record as the trial jury
would have viewed it. Jackson, 780 F.2d at 311; Dimas, 3 F.3d at
1020; Kyles, 514 U.S. at ___, 131 L.Ed. 2d. at 506.

3.  Milkovich's Recantation Was Not Reviewed In Context And
    His "New Evidence" Revelations Were Ignored

The Court considered Milkovich's recantation with the typical
"[r]ecanted testimony is suspect" bias, Doc. 932, p.11, and typi-
cal recantation standard. id. This case is, however, no such case,
but a capital murder case involving the knowing use of perjured
testimony, prosecutorial destruction of evidence and perpetual ef-
forts to cover them up. It is a Rule 33 proceeding involving Brady
violations that requires  consideration of the trial jury's assess-
ment of this evidence.

But the District Court severed the Milkovich revelations,
limiting it to mere recantation. Id., pp.10-11. In fact, it in-
cluded Milkovich's admissions that the drug trial was a mere "sham"
to hold Appellant while the Government built a murder case against
him, Korris Affidavit ¶5, Suppl. Exh. B (Doc. 904), and that AUSA
Kit Morrissey compelled agents to re-write reports that failed to
contain material she desired and that Agent Fox's notes were so
poor that he relied on Milkovich's notes to write his reports. id.,
¶17. He also said Morrissey, and agent Fox and Martens lied at his

32

disciplinary hearing and that Bronnie was having a sexual affair with her lawyer Frank Fabri while he negotiated her immunity in exchange for testimony against Appellant. id. All of this is confirmed by a second of three witnesses. Affidavit of Renee Westmoreland, ¶¶5-6, 9, Suppl. Exh. C. (Doc.904).

### The District Court ignored ALL of this new evidence.

The Court determined that since Milkovich did not testify at "the murder portion of the trial...the recanted testimony could not have impacted the jury's decision because he did not testify," Doc. 932, p.11, and that as Officer Calvin Dye did testify that Appellant made the post arrest statement and never recanted, id., the unavailability of Milkovich at the murder trial is of "little impact." id., p.12.

The instant claims require assessment of how the trial jury would have assessed the withheld evidence in relation to the other evidence and record as a whole. Jackson, 780 F.2d at 311; Dimas, 3 F.3d at 1020; Kyles, 514 U.S. at ___, 131 L.Ed. 2d at 509. "[T]he question is whether the result would have changed if the prosecutors disclosed the evidence at the time, not whether the outcome would differ if the case were tried today." Dimas, 3 F.3d at 1019 n.3.

It's true that Officer Dye testified to the statement, but the Court failed to comprehend that Milkovich's so-called recantation is not recantation relative to the murder trial and its jury. It actually constitutes new evidence in respect to that trial. Moreover, FBI Agent Kale Jackson participated in the arrest and Milkovich admits neither of them obtained any such statement from Appellant.

See Renee Westmoreland Affidavit ¶3 (Doc. 904) Neither Jackson's notes nor reports of that arrest vis-a-vis the statement nor Jackson himself were produced by the Government. If Jackson produced such notes and reports, they are clearly material evidence of the transaction. They are Brady material and in light of the new evidence produced in this Rule 33 proceeding the only reasonable explanation for their non-production or an affidavit by Jackson - all exclusively under the prosecution's control and possession - it that it would counter Dye's false statements. See adverse inference rulings, supra.

Furthermore, Milkovich's testimony was brought into the murder trial to admit extremely prejudicial evidence against Appellant, see Westmoreland II, 312 F.3d at 310, and was expressly relied upon to affirm the murder convictions. id. The new evidence would have clearly under these circumstances compelled the Government to produce Milkovich and in any case permit Appellant to do so to impeach Dye and preclude the tapes. The District Court by prohibiting Appellant to call Milkovich deprived him of the substantive rights "to make any proof that he can produce by lawful witnesses" and to compel their appearance. 18 U.S.C. § 3005 (capital case). Moreover, Jackson would at that point become an essential witness and his reports crucial (and Brady) material.

The District Court's failure to consider all the new evidence and the trial record together, which the Brady standards require, Jackson, 780 F.2d at 311; Dimas, 3 F.3d at 1020; Kyles, 514 U.S. at ___, 131 L.Ed. 2d at 509, is gross error.

4.   The Abortion Evidence Was Not Considered In Light Of
     All The Evidence And Record

It is not disputed that Bronnie had had abortions during the
period after her husband's arrest and, Appellant has submitted sub-
stantial evidence that during that period she had been having an
affair with lead investigator Milkovich.

In context, the evidence indicates that the affair was on-going
by March of 1998, R33 Exh. F (Tina Kuehl's eye-witness sighting);
Sgt. Hillman Int. of Milkovich 7/23/2000 (admission that "anxiety
problems" developed in March 1998 from relationship with Bronnie
and carried over after transfer to District 18, Sept. 1998), by
April/May of 1998, Suppl. Exh. O (Lahmeyer Affidavit); A.H., p.637
and Interview of Officer McAmish 8/2/00, p.5(McAmish and Milkovich's
discussion of afair prior to transfer to District 18); Supp. Exhs.
B ¶17 and C ¶9 (Milkovich's admission that his and Martens' trip to
the Westmoreland farm occurred in spring of 1998); A.H., 241-42,
252, 257 (Agent Martens' discussion of Bronnie w/Milkovich during
trip to Westmoreland farm), R33 Exh. D (Affidavit of Amy Wade), and
by August 1998. R33 Exh. E (Affidavit of Greg Schmidt).

As of March 1998, Bronnie arguably had had three abortions
while her hasband languished in jail, R33 Exh. F, for what was a
"sham" trial to hold him so a murder case could be made. Suppl.
Exhs. B ¶15 and C ¶5. That Bronnie had had abortions during the
time she was working with the prosecutors is certain. See Govt's
Response pp.19-20 (Doc. 918)(citing Trial Trans., Vol. IX, pp.16-17);
Memorandum and Order, pp.9-10)(same). The Government and Bronnie
pressed hard to keep the fact and circumstances of the abortion

35

(or abortions) from the jury and Judge Stiehl ensured they did.
Tr. Trans., Vol. IX, p.17 (holding the abortion constituted "matters
outside the case."). No hearing on that matter was ever held.

If the fetus was fathered by Milkovich, it is certainly of
extreme importance to the capital case then on trial. As the record
indicates, Bronnie seems to have been ready to spread her legs for
virtually anyone, anywhere and any time. Bronnie's credibility was
extremely important to the successful conviction of her husband.
Even if Milkovich wasn't the father, the abortion (as well as
Bronnie's bed-jumping) was very impeaching to her character and
credibility. As such, all information relative to any abortion or
affairs known to the Government is Brady-material. Kyles, 514 U.S.
at ___, 13 L.Ed. 2d at 505; Bagley, 473 U.S. at 676. How much more
so if the government procured it! And, more so yet if fathered by
a government agent involved in the case![10] As this Court has emph-
asized, "exposing a witness's motive to lie is a 'core value' of
the Sixth Amendment's Confrontation Clause." Salem, 578 F.3d at
686 (citing cases).

Bronnie was seeking (or arguably had already obtained) immunity
in exchange for her testimony. That alone is sufficient to chall-
enge her credibility. AUSA Kit Morrissey needed Bronnie's testimony,
and according to Milkovich, Morrissey never hesitated to fabricate
or change evidence necessary to get the convictions. Suppl. Exhs.
8 ¶17 and C ¶15. Milkovich also said that the reason Morrissey had
to rehearse Bronnie's testimony for months was because she was a

---

10. A question tends to arise whether Bronnie - known to sexually
activate when alone with a man - was ever alone with any other
prosecution officers.

liar and she had to "get the story straight." id. Exh. C ¶8.

The circumstances of the abortion(s) particularly if Morrissey helped procure or finance them of its own force could have put the entire investigation under a different light, Kyles, 514 U.S. at ___, 131 L.Ed. 2d at 506, and its "significance" cannot be properly ascertained upon the incomplete record. Agurs, 427 U.S. at 108. See Salem, 578 F.3d at 684-87 (an incomplete record procludes Rule 33/Brady determinations).

The mysteriously undated immunity letter may be related to the abortion(s), the affair or even other surreptitious matters that reeks from this case.

Prohibiting testimony on the abortions at trial violated 18 U.S.C. § 3005 and the new evidence shows Brady violations and the knowing use of perjury.

5.    Failure to Hold Evidentiary Hearing Was Error

In light of all the facts and the record as a whole, Appellant has overwhelmingly proved that the affair began before his trial and the prosecution knew it did while subborning perjury and per-mitting it to go uncorrected. Appellant's burden of proof is sub-stantially less than a "preponderance," Kyles, 514 U.S. at ___, 131 L.Ed. 2d at 506, and the record wholly undermines any confidence in the capital murder trial's outcome. id.

However, at the least, the record cannot be considered so complete as to support the District Court's holdings on any matter decided. Deliberately ignoring the new evidence in the Steve Korris

and Renee Westmoreland affidavits, refusing to consider the Lah-
meyer affidavit because of a non-relative difference of personal
opinion by Judge Stiehl, omitting consideration of Officer McAmish's
crucial statements as well as Milkovich's himself indicating an
active affair prior to the first trial, and refusing to consider
the new evidence and existing record together is not an appropriate
method of adjudication. Agurs, 427 U.S. at 108 ("the significance
of...evidence can seldom be predicted accurately until the entire
record is complete."). If the record in Salem, 578 F.3d 682, Dimas,
3. F.3d 1015 and Barkauskas, 878 F.2d 1931 are indicators, to decide
this case against Appellant without a hearing would be to simply
destroy any standard for Rule 33/Brady-type claims.

Arguably, in this case a hearing should have been required as
a matter of due process of law. E.g., Wong Yang Song v. McGrath,
339 U.S. 33, 49-50 (1950)(indicating when hearings are constitu-
tionally required), Cf. Morgan v. United States, 298 U.S. 468 (1936)
("Morgan I"); Morgan v. United States, 304 U.S. 1 (1938)("Morgan
II") and 304 U.S. at 25-26 (Per Curiam on rehearing). A hearing is
especially necessary where the "context" involves the "government
itself," Morgan II, 304 U.S. at 18, and becomes most evident where
the court "adopt[s] proposals" of a "active prosecut[or] of the
government." id., at 20. Comparison of Judge Shiehl's Memorandum
indicates he merely tracked the Government's Response and with
slightly disparate modification of language adopting it item-for-
item, argument-for-argument and omission-for-omission-for-omission.

6.  Proper Consideration Of The Claims, Evidence And Whole Record
    Together Requires Reversal And Remand For A New Trial Or, Min-
    imally, Remand For A Full Hearing Under The Correct Standards

Appellant repeatedly asserted "new" knowledge of the affair
since early 1998. R33 Motion, pp.9, 12, 24. He expressly alleged
that the witnesses, including Wade and Schmidt, were "recently dis-
covered," id., p.29, relative to August 27, 2002. id., p.38.
"Recently" by any definition means "of late origin or occurrance;
relatively near in past time." Webster's Integrated Dictionary and
Thesaurus 2006. Thus, Judge Stiehl's finding Tina Kuehl's affidavit
"fatal[ly]" defecient because Appellant did not state "when" he
learned of it, Memorandum, p.7, while isolating it for the whole
new evidence on the matter was twice error. See Estelle v. Gamble,
429 U.S. 97, 106 (1976)(pro se pleadings to be construed liberally).
And see Jackson, 780 F.2d at 311 (Brady material to be considered
upon whole record); Dimas, 3 F.3d at 1020 (same); Kyles, 514 U.S.
at ___, 131 L.Ed. 2d at 509 (new evidence construed in "context of
the existing or potential record"); Agurs, 427 U.S. at 108 ("sign-
ificance of...evidence" requires "complete" record).

Although acknowledging Appellant's new evidence included a
"series of affidavits," Memorandum, p.7, the District Court not
only isolated them from each other, but from other evidence (Illin-
ois State investigation records) and from the trial record. id.,
p.4 (reviewing "each...allegatio[n] individually"). The Court also
denounced "'impeachment evidence'" for purposes of Brady, id.,
pp.5-6, and held Appellant to the "severe burden" the Supreme Court
rejected. Compare Memorandum, pp.6, 8 (employ four-part general

standard for Rule 33 motions requireing movant to prove "probabil-
ity" of  acquittal at new trial) with Agurs, 427 U.S at 11 & n.19
(rejecting "probability" of "acquittal" "standard generally applied
...for new trial under [Rule] 33"); Kyles, 514 U.S. at ___, 131
L.Ed. 2d at 506 (noting Agur's "rejected...standard...requir[ing]
...probability...[of] acquittal").

The District Court thus refused to consider the new evidence's
impeachment value, because as such it would impeach the entire
Government's case, placed upon Appellant the "severe burden" of
proving Agur's "rejected...standard" and even then applied it wrong.
Memorandum, p.8 (finding Tina Kuehl's sighting of Milkovich coming
out of Bronnie's bedroom in March 1998 tucking in his shirt as
failing to "rise to the level of material evidence  which would
likely lead to an acquittal in the event of a re-trial."). Thus,
the Court ignored the affidavit's impeachment value for Brady
purposes, applied the wrong standard and incredibly applied the
wrong standard to a wrong jury. Newly discovered Brady material is
not to be considered in light of what a new and different jury might
find, but to the jury that heard the case. Jackson, 780 F.2d at 311;
Dimas, 3 F.3d at 1020 & n.3; Kyles, 514 U.S. at ___, 131 L.Ed. 2d
at 506. Not only does review focus on the "confidence in the ver-
dict" actually rendered, id., "it is not a sufficiency of the evid-
ence test" and does not turn upon "whether there would...have been
enough left to convict." id. All Brady "omissions must be evaluated
in the context of the entire record," Agurs, 427 U.S. at 112, "both
existing and potential." Kyles, at ___, 131 L.Ed. 2d at 509.

In context "both existing and potential," Martens and Milk-
ovich would both have testified that they took the trip to the
Westmoreland farm and the junk yards together. Milkovich would
have said it occurred in the spring of 1998. Suppl. Exh. C ¶9.
Lahmeyer would have confirmed that. id., Exh. O. Tina Kuehl would
have testified to Milkovich in Bronnie's bedroom in March 1998,
R33 Exh. F, and Wade and Schmidt would have testified to their
sightings respectively in May and  August 1998. R33 Exhs. D & E.
McAmish would have testified that his discussion with Milkovich
about Bronnie occurred prior to Milkovich's transfer to District
18, A.H., pp.637, 639; 8/2/00 Interview, p.5, and Milkovich or his
department heads would have testified (and did) that the transfer
occurred in September 1998.

Even omitting the Wade and Schmidt testimony, the record re-
flects that the jury would very likely have believed the officers,
Lahmeyer, and Tina over the admittedly untrustworthy Bronnie. And
add to that Milkovich's testimony that his "anxiety problems" began
in March 1998 because of his unhealthy interest in Bronnie and he
carried them with his transfer to District 18 in September of
1998, what could the jury conclude? The abortions in light of
Bronnie's overall sexual behavior and the revelations in Milko-
vich's love-letters as to her  true character would have more than
just omitted her testimony from credible consideration. The jury
could hardly conclude other than the affair was occurring prior to
the first trial, Bronnie was committing perjury and all evidence
was dubious!

When the jury heard this with Milkovich's potential testimony

that Appellant did not make the statements alleged by Officer Dye and that AUSA Morrissey ordered fabrication and destruction of records, Supp. Exhs. B ¶17 and C ¶5, greater doubt to the Government's evidence would have resulted.

No confidence in the verdict could possibly remain. Thus, the District Court's review under the wrong standards, misapplication of even those standards, refusal to consider all the new evidence in context with the record as it existed and as it would potentially have existed with this evidence is such a gross misapplication of fact and law that decision must be reversed.

V.    THE EIGHT-YEAR DELAY VIOLATES DUE PROCESS OF LAW, CONSTITUTIONAL AND STATUTORY SPEEDY TRIAL RIGHTS, AND THE FEDERAL RULES

A.    Standard Of Review

Questions of law, including constitutional requirements, and mixed questions of fact and law are reviewed de novo.

B.    Summary Of Argument

Deliberate delay of eight years over objections by Appellant during the course of which key witnesses have died, evidence has been destroyed, other witnesses are unavailable and memories, etc. have faded all relating to claims of withheld Brady material, known perjury by the prosecution, fraud on the court involving a capital murder trial is so outrageously excessive as to violate due process of law and constitutional/statutory trial rights as well as the rules governing criminal procedure.

42

C.    Argument

Rule 33 turns upon the "interests of justec." "[J]ustice is supposed to be swift but deliberate," Barker v. Wingo, 407 U.S. 514, 521 (1972), but in a Rule 33 proceeding "[i]t is in the interest of justice that a decision on the propriety of a trial be reached as soon after it has ended as is possible, and that decision be not deferred until the trial's story has taken on the uncertainty and dimness of things long past." United States v. Smith, 331 U.S. 469, 476 (1947).

This is a criminal proceeding which requires proceeding at the earliest possible schedule, F.R.Cr.P. 50, and the Criminal Rules are to be interpreted...to eliminate delay." F.R.Cr.P. 2. This case involves Appellant's "right to a fair trial mandated by the Due Process Clause of the Fifth Amendment," Agurs, 427 U.S. at 107, his constitutional and statutory rights to compel production of "witnesses in his favor," Sixth Amend.; 18 U.S.C. § 3005, and his constitututional and statutory rights to a speedy trial. Sixth Amend.; 18 U.S.C. § 3161 et seq. Thus, apart from the Rules the "factual context" upon which this proceeding went forth demonstrates "good cause" for "expedite[d]...consideration" many years ago. 28 U.S.C. § 1657(a).

"[J]ustice delayed is justice denied," Hinckle v. Henderson, 135 F.3d 521, 523 (7th Cir. 1998), is a principle of long-standing. Magna Carta, c.29 [c.40 of King John's Charter (1215; c.29 of King Edward's Charter (1297)] (1225)("To none will we sell, to none will we deny or delay, right or justice.).

Judge Stiehl, over objections, delayed this proceeding for over eight(8) years. There is nothing in the record, except Appellant's motion to recuse him for which mandamus was sought in this Court, see Westmoreland III, supra, Case No. 1569, and Milkovich's revelation that Judge Steihl "did not like [Appellant] or his family," Suppl. Exh. C ¶4, that even remotely explains the "extreme age" of this proceeding. Memorandum, p.5 n.3.

Eight years is grossly inordinate. Lowe v. Duckworth, 663 F.2d 42, 43 (7th Cir. 1981); Dozie v. Cady, 430 F.2d 637, 638 (7th Cir. 1970). Due process and speedy trial concerns arose many many years ago. Harris v. Champion, 15 F.3d 1538, 1557-61 (10th Cir. 1994)(collecting cases). See United States v. Gray, 147 F. Supp. 2d 902, 908-909, 912-913 (W.D. Tenn. 2001)(finding nearly four-year delay in Rule 33 proceeding to violate both due process and Sixth Amendment Speedy Trial rights), rev'd, 52 Appx. 650, 2002 WL 31684753 (6th Cir. 2002)(finding that because claim for new trial was wholly devoid of merit, after full hearings on whether gov't witness' testimony was false, and, hence, no possibility of prejudice could arise under Barker v. Wingo test without which due process/speedy trial considerations could not apply).

Richard Abeln committed suicide in the United States Penitentiary at Pollock, Louisiana in December 2002. He was a key witness. Milkovich obtained his testimony. The loss cannot be overstated.

Crucial records Appellant has tried to obtain from the Bellville, Illinois Sheriff's Office regarding property alledgedly

receipted by Milkovich and provided him by Bronnie in 1998 prior
to his first trial according to information and belief was destroyed
by the office in 2005. See Appendix A attached hereto (Affidavit
of Investigator Steve Korris, Dec. 29, 2010).

Memories have and continue to fade and witnesses have dis-
appeared. Not only has the "extreme" delay prejudiced a new trial,
it likely has prejudiced a fair hearing on the merits of this
proceeding.

At no time did the Government demand, as did Appellant, a
hearing and/or swift resolution. Thus, the Government virtually
encouraged the delay. Appellant, moreover, proceeded pro se, and
in light of the Government's duty to ensure "'that justice shall
be done,'" Kyles, 514 U.S. at ___, 131 L.Ed 2d at 509 (quoting
Berger v. United States, 295 U.S. 78, 88 (1935)), it should have
moved the Court itself long ago to do that justice due in timely
fashion. The delay "must rest with the government." Barker v.
Wingo, 407 U.S. at 531.

Thus, the prejudice should be assessed as to this proceeding
and its merits as well as that inhering in a potential new trial.

VI.   THE DISTRICT COURT SHOULD HAVE APPOINTED COUNSEL

A.   Standard of Review

Denial of a constitutional right to counsel is reviewed de
novo. Where the right exists, its complete denial deprives the
court of jurisdiction. Johnson v. Zerbst, 304 U.S. 458 (1938).

B.    The District Court ignored outstanding motions to appoint
counsel in this Rule 33 proceeding filed while direct appeal was
pending. This Court in Kitchen v. United States, 227 F.3d 1014
(7th Cir. 2000) established that Rule 33 motions filed while dir-
ect appeal is pending embraces the Sixth Amendment right to coun-
sel. Moreover, this proceeding involves review of a capital murder
trial and verdict and Congress requires appointment of two such
counsel in such cases. 18 U.S.C. § 3005. The District Court
delayed this proceeding for over eight years and has addressed
this constituional issue with one word "DENIED."

C.    Argument

After the eight-year delay, the District Court denied Appel-
lant's motions for appointment of counsel. Docs. 899 and 925. They
were denied without discussion. Appellant's Rule 33 motion was
filed while direct appeal was pending and he relied specifically
upon this Circuit's decision in Kitchen v. United States, 227 F.3d
1014 (7th Cir. 2000). Thus, this proceeding was "in aid of [the
then-pending] appeal of the conviction and sentence" and "not a
collateral attack." 227 F.3d at 1019. As such, it involves the
Sixth Amendment right to counsel, United States v. Berger, 375
F.3d 1223, 1226 (11th Cir. 2004); Kitchen, 227 F.3d at 1019, and
is mandated by statute. 18 U.S.C. § 3006A(a)(1)(H)-(I). Even if a
Rule 33 proceeding is "ancillary" to the criminal case, it requires
appointment of counsel for indigents, 18 U.S.C. § 3006A(c), and in
light of Kitchen per F.R.Cr.P. 44(a).

46

This Rule 33 proceeding raised Brady claims, which must be viewed against the verdict rendered. Appellant proceeded to trial under capital charges for which he was subject to the death penalty. The verdict in question is a death penalty verdict and in any case a capital case does not cease to be capital because the death penalty was not imposed. "The test is not the punishment imposed, but that which may be under statute." Fitzpatrick v. United States, 178 U.S. 304, 307 (1900).

In any case, five life sentences and Appellant's dislexia compelling his resort to assistance by other prisoners (brought to the District Court's attention), should have compelled appointment of counsel particularly in light of the nature of the claims. Had the Court timely appointed counsel possibly a hearing would have properly been held or more efficient evidence and affidavits procured. Almost certainly, the "extreme" delay would have been averted.

It was error both constitutionally and statutorily within the purposes of Kitchen to fail to appoint counsel.

## VIII. JUDGE STIEHL SHOULD HAVE RECUSED HIMSELF IN THE INTERESTS OF AND FOR THE APPEARANCE OF JUSTICE

### A.   Standard of Review

Recusal under 28 U.S.C. § 455 is self-executing. "Appellate review of such claims is de novo, and the standard of proof is whether a reasonable perosn would be convinced that the judge was biased." Taylor v. O'Grady, 888 F.2d 1189, 1201 (7th Cir. 1989).

### B.   Summary of Argument

Judge Stiehl was on notice that Appellant believed he could

not fairly adjudicate the claims in his Rule 33 motion and related motions. Moreover, new evidence of his bias became part of the evidence required to be analyszed. Judge Stiehl ignored that evidence and facially applied bias in his willfully delayed adjudication - a delay so notoriously long that it alone seriously raises the question of partiality. Moreover, his analysis as shown in the merits discussion was factually and legally erroneous to such degree that deliberation seems apparent.

C.   Argument

Appellant unsuccessfuly sought to compel Judge Stiehl to recuse himself from consideration of this Rule 33 proceeding. First by motion pursuant to 28 U.S.C. § 455 (Doc. 893) which was denied (Doc. 895) followed by petition for mandamus to this Court which was also denied. See Westmoreland III, Case No. 03-1569.

Judge Stiehl permitted Appellant's drug trial to proceed largely, if not mostly, upon the murder evidence through hearing statements of various officers. Appellant was convicted and Judge Stiehl sentenced him to life imprisonment for the murder, which this Court had to correct. See Westmoreland I, 240 F.3d at 635-36. Thus, Appellant proceeded to trial with a judge who had predetermined his guilt.

At the murder trial, Judge Stiehl permitted wholly inadmissible evidence. Westmoreland II, 312 F.3d at 311. Although this Court at that time found that "[t]he prejudicial effect certainly outweighs any probative value," id., it found the matter harmless. 312 F.3d at 312. The case in its current posture is of course quite

48

different.

The District Court applied Tina Kuehl's affidavit not in light of all other evidence and the whole record as required for Brady claims, but isolated and in light of its own prejudice - clearly conclusive - that she had "assisted Bronnie in the destruction of evidence and obstruction of justice." Memorandum, p.8.

Part of Appellant's new evidence includes Milkovich's revelation that AUSA "Kit Morrissey, and her team, along with Judge Stiehl, did not like Guy Westmoreland or his family" and that "they...hated Richard Burke, [Appellant's] first lawyer." Suppl. Exh. C ¶4.

Judge Stiehl wasted no time denying Appellant's motion for recusal (i.e., barely over a month), yet delayed every crucial motion in this proceeding, including the Rule 33 motion itself, for over eight years. And, when he finally did, he merely followed the Government's Response much like a script. The delay has prejudiced Appellant and the interests of justice. See V, supra.

The record of this proceeding, the new evidence and Judge Stiehl's consideration and his refusal to properly consider it, as demonstrated in this brief and record, demonstrates a bent mind. As Alexander Hamilton said:

> Who would be willing to stake his life...upon the verdict of a jury acting under the auspices of a judge who had predetermined his guilt?

The FEDERALIST PAPERS, p.399 (Clinton Rossiter 1961 ed.).

And Congress has mandated that judges recuse themselves under conditions brought to their attention and for reasons known to themselves. 28 U.S.C. § 455. Moreover, the statute does not require

actual bias and intervenes to ensure its appearance. id. This
record more than satisfies the requirements of § 455 and Judge
Stiehl should have recused himself even if he is not biased, as
upon the record a reasonable third-party would perceive that he is.
Appellant adopts and incorporates the record (on file with this
Court) in Westmoreland III, Case No. 03-1569 and applies it to
the now more developed record, which he believes will convince
this Court that another judge should have decided the instant motions.

## VIII. CONCLUSION

The record here before this Court shows not only such a delib-
rate and outrageous delay in deciding the very serious claims raised
- claims of such atrocious governmental misconduct in a capital
murder case - that the public interest in the truth and a full in-
vestigation requires a close scrutiny.

The record at best is incomplete and insufficient for the
denials issued by the District Court. Although, as Appellant's
burden was light - i.e., less than a preponderance, Kyles, 514 U.S.
at ___, 131 L.Ed. 2d at 506, the District Court applied the wrong
standards and then applied them wrongly (i.e., isolated from the
factual record).

Moreover, even if this Court's holding in Kitchen, supra, did
not mandate appointment of counsel, the serious claims supported
by both witnesses and the existing record should have compelled
such appointment in the interests of justice.

On these facts and this record, this Court should reverse the

District Court's order and remand to the District Court presided over by another judge for a new trial with haste. A hearing should be ordered to determine whether the extreme delay has prejudiced Appellant's right to a new trial or deprived him of a speedy trial (constitutional or statutory) in light of all circumstances. Alternatively, this Court should remand for a full hearing upon the under lying claims so a complete record can be made and the issues fairly decided.

This Court should in light of these circumstances act sua sponte to expedite this appeal and proceedings and require whatever means and methods necessary to achieve justice (e.g., appoint counsel, order fuller briefings, hold a fact hearing of its own to minimize further delay, subpeona records, etc.).

Respectfully submitted,

Guy J. Westmoreland
Appellant Pro Se
Reg. No. 04292-025
U.S. Penitentiary
Terre Haute, IN   47808

## AFFIDAVIT

I, Steven John Korris, swear and affirm as follows:

On Dec. 23, 2010, at the St. Clair County sheriff's office in Belleville, Illinois, I asked a desk officer if I could obtain a copy of a property receipt for Guy Westmoreland.

The officer entered the name in a computer and asked if the date of arrest was Jan. 6, 1998. I said it was. The officer turned his screen toward me and I saw a photograph. He asked if it was the right person. I said it was.

He asked me to wait for the person in charge of records.

Another officer soon appeared and asked how she could help. When I repeated my request, she said the receipt does not exist. She said all records are destroyed after seven years. I asked if that was the policy of the office. She said it was state law.

I asked her name. She said Sergeant Sutherlin, and she spelled it. I thanked her and left.

Further affiant sayeth not.

Steven John Korris
92 Thorncliff Lane
Kirkwood MO 63122

Signed and sworn before me this 29th day of December, 2010.


**Cathie Hughes**
**Notary Public - Notary Seal**
**State of Missouri**
**Commissioned in St. Louis County**
**My Commission Expires: Oct 08, 2012**
**08654034**

DECLARATION OF SERVICE

Appellant, Guy J. Westmoreland, pro se, hereby declares under penalties of perjury pursuant to 28 U.S.C. § 1746 that he mailed four copies of his Opening Brief and Motion to Relax Rules relative thereto to the Clerk's Office of this Court certified with First-Class Postage and one copy of each to:

> Thomas Leggans, Assistant U.S. Attorney
> Nine Executive Drive
> Suite 300
> Fairview Heights, IL   62208

by placing them in the prison mail system on this _21_ day of March, 2011.


Guy J. Westmoreland, pro se
Declarant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 98-CR-30022-WDS |
| | ) | |
| GUY J. WESTMORELAND, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**STIEHL, District Judge:**

Before the Court are defendant's pro se motion for New Trial (Doc. 890) a Supplement to that motion (Doc. 904) and two Motions to Appoint Counsel (Docs. 899 and 925), as well as other related motions. The government has filed a response to the motion for new trial, and the supplement (Doc. 918) and the defendant has filed a reply (Doc. 923).

The defendant was indicted on a Fourth Superseding Indictment and charged with Conspiracy to distribute and possess with intent to distribute controlled substances (Count 1); using and carrying a firearm during and in relation to a drug trafficking crime (Count 2); causing the interstate travel of Debra Abeln, with the intent to murder Debra Abeln (Count 3); conspiracy to cause the interstate travel of Debra Abeln with the intent to murder Debra Abeln (Count4); the murder of Debra Abeln with the intent to prevent her communication to law enforcement regarding a drug trafficking conspiracy(Count 5); and using and carrying a firearm during and in relation to a crime of violence (*See Fourth Superseding Indictment,* Doc. 648)

The Court bifurcated the trial and held the trial related to the drug charge in August of 1998. (Westmoreland I trial), and the murder-related charges in 2001. The drug conviction was

appealed and affirmed, *United States v. Westmoreland*, 240 F.3d 618, 637 (7th Cir. 2001) (*Westmoreland I*). The murder related charges were appealed and affirmed in *United States v. Westmoreland*, 312 F.3d 302 (7th Cir. 2002) (*Westmoreland II*).

This motion for new trial relates to the trial on the murder-related charges. The defendant asserts that he is entitled to a new trial on the grounds that he has "newly discovered evidence" that the affair between the investigating case agent, Marty Milkovich, and the defendant's wife, Bronnie Westmoreland [1](which was revealed before the trial) was of such a nature that it warranted a new trial, and a hearing on this matter. He also raises claims that Milkovich recanted his testimony from the first trial (he did not testify at the second trial) concerning Westmoreland's post-arrest statement; and his third claim is that Special Agent Kevin Martens testified falsely during Milkovich's disciplinary hearing.

## I.   BACKGROUND

The defendant and his co-defendants conspired to murder Debra Abeln, in part to protect a drug trafficking scheme (although it was later learned that she was not a threat to that scheme, she was just a marital encumbrance to her husband, Westmoreland's co-conspirator, Richard Abeln). The scheme was carried out among Westmoreland, the victim's husband, Richard Abeln, and DeAndre Lewis, who was the person hired to commit the murder. The evidence at trial revealed that, at Richard Abeln's request, Lewis, who had worked for Westmoreland, was hired by Westmoreland to kill Debra Abeln at CRT Aviation, in Sauget, Illinois. Richard Abeln and Westmoreland conspired to have the victim brought to the Airport by her husband (in the company of their 12 year old son) where she was shot by Lewis while still in her car.

---

[1]Bronnie Westmoreland was, at the time of the affair, cooperating in the government's investigation of the defendant's role in the death of Debra Abeln.

Westmoreland and Richard Abeln had been friends and business associates in the early 1990s. In late 1996 or early 1997 they began purchasing and distributing cocaine. During the period between the start of their drug conspiracy and the death of Debra Abeln, they acquired some seven kilograms of cocaine and approximately two hundred pounds of marijuana. Richard Abeln had decided that he no longer wanted to be married to Debra Abeln, and complained to Westmoreland that Debra Abeln had learned of their drug activities and had threatened to turn them in to authorities. Westmoreland then made arrangements to take care of Abeln's "problem." They agreed to have Debra Abeln murdered at CRT Aviation in Illinois, and Westmoreland made arrangements with Lewis to commit the murder. Lewis testified that after a failed first attempt, Richard Abeln brought Debra Abeln to CRT Aviation a second time and she was murdered. Westmoreland was on a family cruise during the time of the murder. [2]

As part of the evidence at trial in Westmoreland II, the defendant's wife, Bronnie Westmoreland, testified as to the destruction of evidence (directed by Westmoreland after his arrest) including the destruction of a vehicle involved in the murder. As the government details, the affair between the defendant's wife and Milkovich, was discovered before the second trial, and was disclosed to the defense. The affair was a "significant issue in the case," and was the reason why the government chose not to seek the death penalty against the defendant and his co-conspirator Deandre Lewis (See, Doc. 577). The defendant asserts that the affair actually started earlier than the government has stated, and, therefore, supports his claim to entitlement to a new trial.

---

[2]The Seventh Circuit's decisions on appeal provide a review of the charges against the defendant, and the evidence adduced at trial, so the Court need not repeat those as part of this review. *See, Westmoreland II*, 312 F.3d at 305-06; *Westmoreland I*.

The record reveals that prior to trial, the government revealed, both to the Court and to defense counsel, information it had concerning the affair. In fact, the government provided exhaustively detailed records and investigative files concerning this relationship. The defendant has asserted that the affair actually started as early as March of 1998. There is nothing in those materials which would support any finding other than that the affair began in and around November of 1999.

Before trial the Court ruled, as part of its ruling on the government's motion in limine (Doc. 758), that the defendant could not call Milkovich (whom the government did not call) as a witness in his case solely to impeach him concerning their affair. The Court noted that the affair began more than year after the defendant's conviction on the drug conspiracy charges. *Id.* at 3. With respect to Bronnie, the Court held that the defendant could explore the nature of their affair as a means of impeaching her testimony. The Court noted in that Order, "Defendant's ex parte submission in support of his contention that the affair began earlier is not highly persuasive. It only hints at an earlier meeting between the two, but does not clearly, or even likely, establish any sexual relationship existed." *Id.* at n.3. The Court further directed that before such evidence would be a grounds for impeachment inquiry that the defendant would have to "satisfy the requirements of Fed. R. Evid. 613(b)." *Id.*

The Court is well satisfied that the record which was before it before trial on the murder-related charges, and the record before it now, support a finding that the affair did not start before November of 1999. Nonetheless, the Court will review each of defendant's allegations individually, in an effort to determine whether the defendant is entitled to a hearing on the motion for new trial, and, therefore to the appointment of counsel, or if the motion can be

4

resolved on the pleadings.[3]

## II.   MOTION FOR NEW TRIAL

The defendant first asserts that he is entitled to a new trial because his information indicates that the affair between Bronnie and Milkovich began earlier than November of 1999, as was asserted at trial.  The defendant asserts that it had started as early as March of 1998, and would have impacted the entire investigation of the case. The defendant claims that the Court's finding that the affair began in November of 1999 was prejudicial, because by November of 1999, the bulk of the murder investigation had concluded.  The defense, during the murder trial, was allowed to cross-examine the witness Bronnie Westmoreland, about the affair, when it began,  and how it was carried out.  (Transcript of Trial, vol. IX, p. 12 and following).

The defendant's second assertion is that after the trial in Westmoreland I, Milkovich changed his testimony regarding the defendant's post-arrest statement.  Milkovich had testified that Westmoreland admitted being involved in drug trafficking with his co-defendant, Richard Abeln, but denied that he was involved in the murder-for-hire scheme.  Westmoreland's statement was made to both Milkovich and to Master-Sergeant Calvin Dye.  He has provided the affidavits of persons other than Milkovich as to that recantation, but does not address the fact that it was Dye who testified as to his post-arrest statement at the second trial on the murder-related charges. Therefore, the "recanted" testimony of Milkovich does not change the fact that the jury in Westmoreland II heard only Dye's testimony as to the confession, and any recantated testimony from the first trial could not have influenced the verdict in the murder trial.

---

[3]The Court acknowledges the extreme age of these pending motions.   The Court, has, therefore, undertaken a careful review, to determine if further briefing is warranted in this matter.  After careful review, the Court has concluded that neither further briefing, nor an evidentiary hearing on the matters raised by the defendant are warranted, as set forth more fully above.

Finally, he asserts that Special Agent Kevin Martens lied during the disciplinary hearing

for Malkovich concerning a visit to property that the Westmoreland family owned in Bland,

Missouri, in 1999. The defendant asserts that this visit occurred in 1998, not 1999.

### A    Standard of Review of Motion for New Trial

Rule 33 of the Federal Rules of Evidence provides that a motion for new trial may be

granted based on "newly discovered" evidence if required in "the interests of justice." To receive

a new trial based on such a claim, "the defendant must demonstrate that the evidence (1) came to

[his] knowledge only after trial; (2) could not have been discovered sooner had due diligence

been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably

lead to an acquittal in the event of a retrial." (Insert citation) . As the Seventh Circuit set forth

in *United States v. Erivn,* 540 U.S. 623, 631 (7th Cir. 2008), "To obtain a new trial based on

newly discovered evidence, a defendant must show, among other things, that the evidence in

question 'is material and not merely impeaching or cumulative,' and that it 'probably would lead

to an acquittal in the event of a new trial.' *United States v. Hodges,* 315 F.3d 794, 801 (7th

Cir.2003)."

With respect to "recanted testimony" the Court must determine whether it is reasonably

well satisfied that the testimony in question was false; that the jury might have reached a

different conclusion if the false testimony had not been admitted or if it had known that the

testimony was false; and that the defendant was taken by surprise by the false testimony and was

"unable to meet it or did not know its falsity until after the trial." *United States v. Taylor,* 600

F.3d 863, 870 (7th Cir. 2010).

Ordinarily, "newly discovered impeachment evidence will not warrant a new trial" under

6

*Brady v. Maryland*, 373 U.S. 83 (1963).  Further, evidence is only "material" if there is a

"reasonable probability" *Strickler v. Greene*, 527 U.S. 263,  280 (1999)  that if the evidence had

been disclosed, "the result of the proceeding would have been different." *Youngblood v. West*

*Virginia*, 547 U.S. 867, 869 (2006). "Of course, this means that only admissible evidence can be

material, for only admissible evidence could possibly lead to a different verdict." *United States*

*v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009)(*citing United States v. Silva*, 71 F.3d 667, 670 (7th

Cir.1995)).

<u>1.</u>     <u>Newly Discovered Evidence Concerning the Affair</u>

The critical part of the defendant's motion and supplement to the motion addresses the

affair between Bronnie and Milkovich.  The defendant asserts that the affair started much before

the time asserted by the government, which is critical to his motion because by November of

1999, the murder investigation had been mostly completed, and the evidence of the affair was

relevant as a method of impeaching both Bronnie and Milkovich.  If the affair began earlier than

1998, then the impeachment may have been relevant to the investigation itself, and potentially

that there was a viable challenge to the evidence itself.

In support of his motion, the defendant has filed a series of affidavits that support his

claim that the affair actually began earlier than November of 1999.  In particular, the affidavit of

of Tina Kuehl, the defendant's sister, provides that in March of 1998 she saw a man leave

Bronnie's residence, tucking his shirt into his pants, and that as a result she believed they were

having an affair.  She determined at the trial, in August of 1998 (*Westmoreland I*) that same man

was Milkovich. The defendant does not provide how and, most importantly, *when* he learned of

the revelation which his sister made.  This is fatal to a claim of "newly discovered" evidence

7

which was only learned *after* trial, given that this concern was raised well before the murder-related trial in 2001. As the Court noted above, the defendant had tried to establish before trial that there had been an earlier start date to the affair, which was the subject of the Court's Order at on the Motion in Limine. Critically, the defendant asserts that the Kuehl affidavit is the same affidavit which the Court rejected in the 1998 drug trial, *Westmoreland I.*

As the Court ruled in the murder trial, the defendant's evidence did not support an assertion of an earlier start date to the affair. The quality of that evidence has not improved with this motion, because it the same claim, and the same basic evidence. Not only is this not, in any manner, "newly discovered," given the relationship of the defendant to his sister, and the evidence that she assisted Bronnie in the destruction of evidence and obstruction of justice after the murder of Debra Abeln, (Vol VII, pp. 135-40; Vol. X 34-35), the Court cannot find that this evidence would rise to the level of material evidence which would likely lead to acquittal in the event of a re-trial.

The Court **FINDS** that the affidavits provided by the defendant, i.e. those of Amy Wade and Greg Schmidt, are not of such a nature to support his assertions for a new trial, or even for a hearing on that motion. They are without any foundation as to how the affiants may have been able to identify the individual allegedly involved with Bronnie as Milkovich, and that omission is fatal to their admissibility, and therefore, to their materiality. The defendant asserts that these additional affidavits corroborate the earlier evidence of his sister's observations. That assertion only further undermines his claim that the evidence of an earlier beginning to the affair could qualify as "newly discovered" evidence. The key to his claim of "newly discovered" evidence must be that the evidence was not, and could not have been, known, at the time of the trial. No

8

matter how presented, the defendant's claims are all that this information was known, and in

fact, was raised at trial.

Finally, the defendant asserts that the government suborned perjury because, he

asserts, one of the attorneys for the government, Ms. Morrissey, was involved in efforts by

Bronnie to obtain an abortion, and that Morrissey did so to help cover up the earlier start date for

the affair. The defendant cites a portion of the transcript as follows:

> Q. (By Attorney Rosenblum) Can you even count how many
> discussions you had with
> Morrissey?
> A. Not exactly.
> Q. Too many to count?
> A. I don't know. I can count that high, but . . .
> Q. But it would be a high number, right?
> A. I guess, yeah.
> Q. Would you say that you developed a friendship with her?
> A. No.
> Q. Would you say that she became a confidant of yours?
> A. No.
> Q. Were there times that you discussed with her deeply personal
> things?
> A. Not outside the case.
> Q. Not outside the case?
> A. Huh-uh.
> MR. ROSENBLUM: Could we approach the bench, Your Honor?
> (Whereupon the following proceedings were held at sidebar, out of
> the hearing of the jury:)
> MR. ROSENBLUM: This is leading to this series of other questions.
> Ive asked this witness if they've discussed personal things. I wasn*t
> going to get into the abortion. No discussions about deeply personal
> things outside the case. It would be my contention that her
> discussion about abortions --
> MS. MORRISSEY: Judge, I*d ask him to lower his voice, first of
> all, please.
> THE COURT : Try to do that.
> MR. ROSENBLUM: My discussion --- her discussions with Ms.
> Morrissey about the fact she
> was having an abortion or had an abortion, I think, is now related to
> the case. I think it goes to show the nature and extent of her

relationship with the prosecuting attorney, which goes to bias.
 MS. MORRISSEY: Judge, I disagree. The whole issue came up
because the defendant's sister
was calling members of her husband's family and trying to elicit
them as witnesses on that subject. And that is what was reported to
me. It was during the course of the case, it was, she believed, was
worried about it coming into this as well.
THE COURT: They are matters outside the case.
MR. ROSENBLUM: Okay.
(Whereupon the proceedings at sidebar were concluded. The
following proceedings were held
in open Court:)
Q. (by Mr. Rosenblum) You refer to Ms. Morrissey and Mr. Leggans
as Kit and Tom, do
you not?
A. At times.

TT, Vol. IX pp. 16-17.

It is well settled that the use of suborned perjury may be grounds for a new trial, but such

a claim is "a serious accusation." *United States v. Mahalick*, 498 F.3d 475, 480 (7th Cir. 2008).

Further "it takes more than . . . witnesses' differing recollections to sustain a perjury charge." *Id.*

The defendant's citation to this section of the transcript does not support his claim that there was

any effort by the government to either aide in the acquiring of an abortion, nor to in any manner

suborn perjury. Although such claims are easy to make, due to their serious nature, there must

be more than mere conjecture to rise to the level of such a showing.

The Court finds baseless the defendant's assertion that the transcript in any manner

provides that Ms. Morrissey suborned perjury in this case, *see, Mahalick, Id.*

### 2.    Alleged Recanted Confession of Milkovich

The defendant asserts that Milkovich recanted his confession concerning the drug

connection between the defendant and Abeln. The Court notes that Milkovich was not the only

person who testified during *Westmoreland I* with respect to the drug activities of the Abeln

conspiracy. As the defendant noted in his motion, Special Agent Calvin Dye also testified at the trial that the defendant stated, at the time of his arrest, that he knew nothing about the murder, but *was* involved in the drugs with Abeln. (Tr. X, p. 105 ff.).

Recanted testimony is suspect, in and of itself. When considering the impact of recanted testimony, especially when it concerns allegedly false trial testimony, the Court must consider: "whether: (1) [it is] reasonably well satisfied that the testimony given by [the witness] at trial was false; (2) the jury might have reached a different conclusion absent the false testimony or if it had known that [the] testimony was false; and (3) the defendant was taken by surprise when the false testimony was given, and was unable to meet it or did not know its falsity until after the trial." *United States v. Taylor*, 600 F.3d 863, 870 (7th Cir. 2010).

In this case, the "new evidence" of the defendant's post- arrest statement is that Milkovich changed his testimony. However, Mikovich did not testify at the murder portion of the trial. Therefore, the recanted testimony simply *could not* have impacted the jury's decision because he did not testify. Moreover, as stated above, Calvin Dye did testify as to Westmoreland's post arrest statement, and he has not recanted his trial testimony.

The defendant, with circuitous reasoning, attempts to bring Milkovich into the murder trial, asserting that because Westmoreland's confession led to recovery of cocaine bags, which then implicated his wife, Bronnie, who *was* a key witness at the murder trial (and, who had been in the affair with Milkovich), that Milkovich's recantation was critical to the murder trial. The defendant asserts that therefore, Milkovich's prior testimony in the drug case infected the murder trial, and warrants a new trial, or at least an evidentiary hearing on the matter. Although Milkovich was central to the investigation the defendant had the opportunity to thoroughly cross

11

examine him at the first trial. Although Milkovich's testimony was critical to the *drug* portion of the defendant's trials, the fact that Milkovich did not testify at the murder trial makes his recantation of little impact in the motion for new trial on the murder charges.

The Court, therefore, **FINDS** that the defendant has not raised sufficient grounds for granting a new trial, or for a hearing, based on Milkovich's recanted testimony and the motion on this ground is **DENIED**

### 3.     Newly Discovered Evidence re Trip to the Westmoreland Farm

The defendant also asserts that the government's agent, Kevin Martens, IRS, visit to the Westmoreland farm could not have occurred when Martens believed it did. But, as the government notes, Martens did not testify as to the visit to the farm, therefore, it was irrelevant to the murder trial.

The defendant's focus is on a portion of Martens' testimony at Milkovich's administrative hearing (concerning the improper affair with Bronnie) that he had counseled Milkovich at one time about not being alone with Bronnie once she was a cooperating witness. Martens testified at the administrative hearing that he would have had the conversation with Milkovich when they were looking for a pickup which was thought to have been involved in the murder.[4] The defendant claims that this trip to the farm had to happen in 1998 because Bronnie told the agents, after she began cooperating in 1999, that the pickup had been crushed, therefore, there was no reason for them to go to the farm to look for the pickup. The defendant asserts that Martens stated that "the only reason we knew about the pickup truck came from Bronnie." It is not, however, either inconceivable that the agents would, despite being told that a vehicle had

---

[4]The evidence was that DeAndre Lewis drove the pickup to the murder and then the defendant took the pickup from him.

been "crushed" check out the defendant's farm, and, as Martens stated at the Administrative

hearing, some junkyards.[5] The Court **FINDS** that the testimony of Agent Martens at the

Administrative hearing does not amount to newly discovered evidence that confirms that the

affair took place any earlier than 1999.

## CONCLUSION

The Court has reviewed all of the assertions of the defendant, but **FINDS** that they do not

amount to "newly discovered" evidence which would be the basis for a new trial in this matter.

The Court notes that a hearing in this matter is not warranted, despite the passage of time since

the original motion was filed, because the defendant's "evidence" is simply not newly

discovered.

Therefore, the Court **DENIES** on all grounds raised, the defendant's pro se motion for

new trial (Doc. 890) and to proceed summarily to ruling and for sanctions (Doc. 917). The

Defendant's Motions to Appoint Counsel (Doc. 899 & 925) are **DENIED.**

All other pending motions (Docs. 915 and 931) are **DENIED** as moot.

**DATED: 13 December, 2010**

                              **/s/ WILLIAM D. STIEHL**
                                  **DISTRICT JUDGE**

---

[5]The defendant relies, heavily, on the affidavit of his farm overseer, Thomas J. Lahmeyer, who states that in the Spring of 1998 two agents came to the farm in Bland, Missouri, asking to look over the property. He describes the individuals as two men, in plain clothes, both approximately 5'11" to 6' with medium build (180-190) and light brown hair. The Court has had Agent Martens testify for approximately 20 years. He is not of medium build, and has not, for that period of time, been of that build. Nor has he had brown hair during that period of time. The affidavit is, therefore, not persuasive that agents Milkovich and Martens were the two individuals at the farm in 1998.